[No. 51116–1. En Banc. November 27, 1985.]

CLYDE SPRAGUE, ET AL, *Respondents,* v. SUMITOMO FORESTRY COMPANY, LIMITED, *Appellant.*

752

*Ken Longley* (of *Watson & Longley*), for appellant.

*Perey & Smith,* by *James A. Smith, Jr., Ron J. Perey,* and *Michael B. Tierney,* for respondents.

DORE, J.—This action involves a claim by Clyde Sprague against Sumitomo Forestry Company, Ltd., for breach of contract arising from Sumitomo's unconditional cancellation of a log purchase contract. A jury trial resulted in a judgment of $280,693.03 for Sprague. Except for one element of damages that we hold should have been excluded, we affirm.

## FACTS

Sprague is a logger located in Enumclaw, Washington, who has been active in buying, selling, harvesting and milling timber in various capacities. As it relates to the issues involved in this lawsuit, Sprague's business has two distinct aspects: the harvesting of timber on a contract basis for various timberland owners, and the purchase of United States Forest Service timber sales from which Sprague harvests and sells logs.

Sprague purchased a tract of timber, known as the Flip Blowdown from the United States Forest Service in June 1979. This purchase consisted of approximately 850,000 board feet of old growth, high quality timber, primarily consisting of Douglas fir and western hemlock. Although the Forest Service contract originally required completion of the harvest by June 30, 1980, Sprague succeeded in obtaining a 1–year extension when a previous buyer defaulted on a purchase contract with Sprague.

In the summer of 1980, after the prior breach, representatives of Sumitomo contacted Sprague and expressed a strong interest in the Flip Blowdown timber. Sumitomo is a

subsidiary of a large Japanese company engaged in the purchase and export of logs and lumber to Japan. Sumitomo functions in the Pacific Northwest as a division of the larger corporation, with all major decisions made by its board acting in Tokyo. Hiro Munakata, Sumitomo's log buyer, engaged in a detailed series of conferences with Sprague during July and August 1980. In these discussions, Sprague specifically explained the following to Munakata: (1) because of the earlier breach, Sprague was in precarious financial circumstances and could not withstand a similar breach of contract by Sumitomo; (2) Sprague wanted to perform the contract, as soon as possible, in 1980 so that he could return to other logging commitments which previously had been delayed.

Sprague and Sumitomo signed the contract on August 27, 1980. It is a 2–page document, drafted by Sumitomo, with one exception—Sprague insisted on the year "1980" being inserted as the time for delivery, emphasizing his need to promptly complete harvesting in order to meet scheduled logging commitments to another buyer, Mt. Baker Plywood.

Sprague performed under the contract and as of early October 1980 had felled approximately 100,000 board feet of logs on the Flip Blowdown site to Sumitomo's specifications. In mid–October 1980, Munakata advised Sprague that there were problems with Sumitomo's sawmill, and that Sumitomo might not be able to purchase the logs. Munakata apologized when Sprague reminded Munakata of his earlier assurances of performance.

On October 20, 1980, Sumitomo sent Sprague a letter unequivocally canceling the contract. This was followed by a meeting at Sumitomo's offices during which Sumitomo's general manager asked Sprague to sign an agreed letter of cancellation. Sprague refused. During a subsequent meeting, Munakata again requested Sprague to sign the cancellation letter but again Sprague declined. Ultimately Munakata apologized for Sumitomo's conduct and stated that Sprague had been very honest with him, and he told Sprague he had done nothing wrong, and informed him

that he was quitting the company because of what it had done to Sprague.

Subsequent to receiving Sumitomo's unequivocal cancellation of the log purchase contract, Sprague promptly filed a complaint against Sumitomo for breach of contract. Sumitomo served its answer alleging that Sprague had an affirmative duty to mitigate damages.

After receiving Sumitomo's answer, Sprague mitigated his damages by reselling the timber to five different purchasers at private sales.

At trial Sprague sought to recover the difference between the contract price and resale price of the timber, together with incidental damages arising from Sumitomo's unequivocal cancellation. Sumitomo claimed mutual rescission and asserted affirmative defenses, including that Sprague "failed to proceed as required by RCW 62A.2–702 *et seq.*"

At the end of Sprague's case, Sumitomo moved for a directed verdict. The court denied the motion except as to misrepresentation claims which had been introduced by amendment.

Via a special verdict form, the jury found (1) that there was no mutual rescission; (2) that there was a breach and no waiver; (3) that the contract price was $197,204 and the resale price was $144,924 with net contractual damages of $52,280; (4) that Sprague sustained incidental damages of $216,498 for the following items: (a) cost of refinancing, $39,674; (b) extra transportation cost, $5,612; (c) loss of revenue on Flip Blowdown not covered by contract, $9,121; (d) loss of logging time, 11 weeks, $171,200; and (e) cost of moving tower, $2,115.

The major thrust of Sumitomo's appellate argument here is that Sprague did not give the requisite notice of intention to resell the canceled goods as required by RCW 62A.2–706(3) and, therefore, Sprague is not entitled to recover the difference between the contract price and the resale price.

RESALE PRICE DIFFERENTIAL

The catalog of a seller's remedies in a breach of contract case governed by the sale of goods provisions of the Uniform Commercial Code is found in RCW 62A.2–703. In the present case, the catalog of available remedies can quickly be reduced to two; these are:

1. Resale and recovery under RCW 62A.2–706, or

2. Recovery of the difference between the contract price and the market price under RCW 62A.2–708(1).

At trial Sprague apparently proceeded, pursuant to RCW 62A.2–706, to recover as damages the difference between the resale price and contract price. RCW 62A.2–706(1) provides that if the seller acts in good faith and in a commercially reasonable manner, he may recover the difference between the resale price and the contract price, together with any incidental damages allowed under RCW 62A.2–710, less expenses saved.

RCW 62A.2–706(2) goes on to permit resale at public or private sale. Of critical importance here is the requirement of RCW 62A.2–706(3) which provides that where an aggrieved seller resells goods which are the subject of a breach at a private sale, he must give the buyer "reasonable notification of his intention to resell."

In response to his failure to give specific notice of intention to resell, and in support of his judgment, Sprague argues: that the lack of notice was an affirmative defense which the buyer failed to plead, or that the buyer, from all the surrounding facts and circumstances, knew or should have known that the seller was going to resell the logs.

■ We deal first with whether the buyer needed to plead affirmatively as a defense the admitted lack of actual notice. This issue has not been previously addressed in Washington and only a few courts have reached this issue. Notice has been termed a "prerequisite" and a "condition precedent" to section 2–706 damage claims. 3 A. Squillante & J. Fonseca, *Williston on Sales* § 24–7, at 417 (4th ed. 1974); *Twin Bridges Truck City, Inc. v. Halling*, 205 N.W.2d 736 (Iowa 1973). The burden of showing compli-

ance with the notice requirement has been placed on the seller. *Anheuser v. Oswald Refractories Co.,* 541 S.W.2d 706 (Mo. Ct. App. 1976); *Nipkow & Kobelt, Inc. v. Slifka,* 18 U.C.C. Rep. Serv. 1213 (N.Y. App. Term 1976); *Twin Bridges Truck City, Inc. v. Halling, supra.*

Williston has analyzed the issue as follows:

> Assuming that the seller has an affirmative duty to meet the requirements of § 2–706, a showing by the seller of compliance with this section would make it unnecessary for the buyer to raise a defense of lack of notice. All the buyer need do is show contradictory evidence of the seller's statement that he gave notice of his intention to resell.

3 A. Squillante & J. Fonseca, *Williston on Sales* § 24–7, at 418 (4th ed. 1974). This analysis, which finds notice as a prerequisite to bringing the claim, fits well with Washington law on affirmative defenses. CR 8(c) enumerates certain specific affirmative defenses which must be pleaded, but includes a general clause "and any other matter constituting an avoidance or affirmative defense." While this language is very general, it clearly contemplates matters which are in avoidance or are a specific affirmative defense. It would follow, therefore, that if notice of intent to resell is part of the seller's prima facie case, then lack of such notice would not have to be affirmatively denied.

To recover under RCW 62A.2–706, Sprague was required to give notice of intent to resell. This is an element of the seller's right to invoke the remedies of RCW 62A.2–706. Therefore, the buyer need not plead as an affirmative defense those elements which seller must prove.

Next, can the notice requirement be satisfied by the fact that the buyer knew or should have known that the seller intended to resell? From the plain language of RCW 62A.2–706, the giving by the seller of notice of intention to resell is a specific requirement to entitle seller to claim as damages the difference between resale price and the contract price. The words of subsection (3) are precise: "the seller *must* give the buyer reasonable notification of his intention

to resell." (Italics ours.) RCW 62A.2–706(3).

■ Sprague contends Sumitomo knew or should have known that Sprague would make a resale and hold Sumitomo liable for the difference in resulting recovery. Thus, he argues that there was substantial compliance with the notice requirement. Sprague would have us hold that his filing of a lawsuit is sufficient notice. Whether such filing could ever be adequate notice is not before us. Factually, what is before us is a complaint that alleges a breach of contract and subsequent damages. It gives no notice of the remedy claimed other than damages. It was not an adequate substitute for the statutorily required notice of intent to resell.

### Market Price Differential

■ It is a general rule of appellate practice that the judgment of the trial court will not be reversed when it can be sustained on any theory, although different from that indicated in the decision of the trial judge. *Cheney v. Mountlake Terrace*, 87 Wn.2d 338, 552 P.2d 184 (1976). Although the jury verdict cannot be upheld under the resale method of determining damages, we find that the record supports the verdict under the alternate method of establishing damages, computed by measuring the difference between the market price and the contract price as provided in RCW 62A.2–708. This provision states:

> (1) Subject to subsection (2) and to the provisions of this Article with respect to proof of market price (RCW 62A.2–723), the measure of damages for non–acceptance or repudiation by the buyer is the difference between the market price at the time and place for tender and the unpaid contract price together with any incidental damages provided in this Article (RCW 62A.2–710), but less expenses saved in consequence of the buyer's breach.
>
> (2) If the measure of damages provided in subsection (1) is inadequate to put the seller in as good a position as performance would have done then the measure of damages is the profit (including reasonable overhead) which the seller would have made from full performance by the buyer, together with any incidental damages provided in

this Article (RCW 62A.2–710), due allowance for costs reasonably incurred and due credit for payments or proceeds of resale.

█ It is fundamental under RCW 62A.2–703 and the sections that follow that an aggrieved seller is not required to elect between damages under RCW 62A.2–706 and 62A.2–708. RCW 62A.2–703 cumulatively sets forth the remedies available to a seller upon the buyer's breach. The pertinent commentary thereto indicates specifically that the remedies provided are cumulative and not exclusive and that as a fundamental policy Article 2 of the U.C.C. rejects any doctrine of election of remedy.

█ The seller has the burden of proof with respect to market price or market value. A seller cannot avail himself of the benefit of RCW 62A.2–708 when he has not presented evidence of market price or market value. However, the resale price of goods may be considered as appropriate evidence of the market value at the time of tender in determining damages pursuant to RCW 62A.2–708. *See B&R Textile Corp. v. Paul Rothman Indus.,* 101 Misc. 2d 98, 420 N.Y.S.2d 609 (N.Y. Civ. Ct. 1979); *Dehahn v. Innes,* 356 A.2d 711 (Me. 1976); *Buchsteiner Prestige Corp. of Am. v. Abraham & Straus,* 107 Misc. 2d 327, 433 N.Y.S.2d 972 (N.Y. App. Term 1980); *Klockner, Inc. v. Federal Wire Mill Corp.,* 663 F.2d 1370 (7th Cir. 1981).

While, admittedly, Sprague's resale came after the time for tender, it can still be utilized as a market price. *See Klockner, Inc. v. Federal Wire Mill Corp., supra; Buchsteiner Prestige Corp. of Am. v. Abraham & Straus, supra.* RCW 62A.2–723(2) states:

> (2) If evidence of a price prevailing at the times or places described in this Article is not readily available the price prevailing within any reasonable time before *or after* the time described or at any other place which in commercial judgment or under usage of trade would serve as a reasonable substitute for the one described may be used, . . .

(Italics ours.)

The court is granted a "reasonable leeway" (Official Comments, RCWA 62A.2–723) in measuring market price. During the trial of this action, not only was there testimony to the effect that in an effort to mitigate damages, respondent Sprague sold the Flip Blowdown logs to five purchasers at private sales in 1981 and 1982, there was also testimony that the market price remained at the same level as at the time and place of tender in late 1980.

The net contractual damages of $52,280 ($197,204 contract price–$144,924 resale price) which was awarded respondent under the jury verdict thus equaled the measure of damages available under RCW 62A.2–708(1). We affirm this award.

### INCIDENTAL DAMAGES

Sprague is entitled also to incidental damages. RCW 62A.2–708 provides that the seller is entitled to the difference between the market price and contract price "together with any incidental damages provided in this Article (RCW 62A.2–710), but less expenses saved in consequence of the buyer's breach." Incidental damages are defined in RCW 62A.2–710 as follows:

> Incidental damages to an aggrieved seller include any commercially reasonable charges, expenses or commissions incurred in stopping delivery, in the transportation, care and custody of goods after the buyer's breach, in connection with return or resale of the goods or otherwise resulting from the breach.

At trial, the jury found that respondent sustained incidental damages of $216,498 for the following items: (a) cost of refinancing, $39,674; (b) extra transportation cost, $5,612; (c) loss of revenue on Flip Blowdown not covered by contract, $9,121; (d) loss of logging time, 11 weeks, $171,200; and (e) cost of moving tower, $2,115.

Sumitomo contends that some of these items are not incidental damages but more properly classified as consequential. Consequential damages are *not* allowed except as specifically provided in RCW Title 62A or by other rule of law. RCW 62A.1–106. Washington Comment to section 2–

710 indicates that consequential damages are denied to sellers under the Uniform Commercial Code. RCWA 62A.2–710.

■ The distinction between consequential and incidental damages was made in *Petroleo Brasileiro, S.A., Petrobras v. Ameropan Oil Corp.*, 372 F. Supp. 503, 508 (E.D. N.Y. 1974):

> While the distinction between the two is not an obvious one, the Code makes plain that incidental damages are normally incurred when a buyer (or seller) repudiates the contract or wrongfully rejects the goods, causing the other to incur such expenses as transporting, storing, or reselling the goods. On the other hand, *consequential damages* do not arise within the scope of the immediate buyer–seller transaction, but rather *stem from losses incurred by the non–breaching party in its dealings, often with third parties*, which were a proximate result of the breach, and which were reasonably foreseeable by the breaching party at the time of contracting.

(Citations omitted. Italics ours.)

We find that the loss of logging time is an inappropriate item of incidental damages. Sprague's damage claim for loss of logging time is essentially a claim for lost profits on a contract with Mt. Baker Plywood. In *Petroleo Brasileiro,* the court stated that "consequential damages do not arise within the scope of the immediate buyer–seller transaction [as do incidental damages], but rather stem from losses incurred by the non–breaching party in its dealings, often with third parties . . ." *Petroleo Brasileiro,* at 508. Applying this test to Sprague's claim for loss of logging time, Sprague's loss clearly did not arise within the scope of his contract with Sumitomo; instead, Sprague incurred this loss as a consequence of his delay in performing his contract with Mt. Baker Plywood, a third party. The fact that Sumitomo's conduct proximately caused Sprague's loss is irrelevant to this analysis. The focus is upon losses arising within the scope of the immediate contract. Accordingly, Sprague's loss can only be characterized as consequential. Therefore, the judgment awarded Sprague is reduced by

$171,200.

The remaining costs are not seriously contested by appellant and appear to be appropriate items of incidental damages. *See Bulk Oil (U.S.A.), Inc. v. Sun Oil Trading Co.,* 697 F.2d 481 (2d Cir. 1983); *Lee Oldsmobile, Inc. v. Kaiden,* 32 Md. App. 556, 363 A.2d 270 (1976); *Gray v. West,* 608 S.W.2d 771 (Tex. Civ. App. 1980).

## MISREPRESENTATION

Sprague cross–appeals the dismissal, at the end of his case, of his claims of negligent and intentional misrepresentations. We find no error.

The well established test for granting or denying a motion for a directed verdict has often been stated: the trial court must view the evidence in the light most favorable to the nonmoving party; the motion should be granted only if it is determined that there is no evidence or reasonable inferences therefrom which would sustain a verdict in favor of the nonmoving party. *Davis v. Globe Mach. Mfg. Co.,* 102 Wn.2d 68, 684 P.2d 692 (1984); *Levy v. North Am. Co. for Life & Health Ins.,* 90 Wn.2d 846, 586 P.2d 845 (1978).

The elements of misrepresentation include a misrepresentation of an existing fact. *Beckendorf v. Beckendorf,* 76 Wn.2d 457, 457 P.2d 603 (1969); *Martin v. Miller,* 24 Wn. App. 306, 600 P.2d 698 (1979). The proof must be clear, cogent and convincing. However, if a promise is made for the purpose of deceiving and with no intention of performing, it is actionable. *Markov v. ABC Transfer & Storage Co.,* 76 Wn.2d 388, 396, 457 P.2d 535 (1969). Here, the best that can be said is that Sumitomo, in intraoffice correspondence, recognized the volatility of the log export market. It would make no sense, nor inference of sense, for the buyer to execute a purchase contract with no intention of performing. On the contrary, the inference from the records is that these were such desirable logs for export that they were a bright hope in a dismal market. Sprague fails on the proof.

## AMENDMENT OF COMPLAINT

Finally, Sprague contends the trial court erred in not allowing an amendment of the complaint to allege a violation of the Consumer Protection Act, RCW 19.86. CR 15(a) provides that after one matter of course amendment before a responsive pleading is served, the court must grant leave to amend. A subsequent leave to amend is within the discretion of the trial court. *Sanwick v. Puget Sound Title Ins. Co.*, 70 Wn.2d 438, 423 P.2d 624, 38 A.L.R.3d 315 (1967). Here Sprague amended twice, then sought a third amendment, which was denied. Then permission was given to amend to include misrepresentation, but not RCW 19.86 violations. That was 1 year 8 months after the original complaint was filed and shortly before trial. We find no abuse of discretion in denying Sprague's motion for an amendment so he could allege a violation of the Consumer Protection Act.

The judgment is reduced by $171,200 to eliminate an improper element of damages. As modified, the judgment is affirmed.

DOLLIVER, C.J., and UTTER, BRACHTENBACH, PEARSON, ANDERSEN, CALLOW, GOODLOE, and DURHAM, JJ., concur.

Reconsideration denied January 9, 1986.