**SHARP ELECTRONICS CORPORATION,**
**Plaintiff,**

**v.**

**LODGISTIX, INC., Defendant.**

**Civ. A. No. 89–1063–B.**

United States District Court,
D. Kansas.

Sept. 15, 1992.

Craig A. Kreiser, Curfman, Harris, Rose, Weltz & Smith, Steven J. Rupp, Alan L. Rupe Law Offices, P.A., Wichita, Kan., for plaintiff.

David L. Nelson, Wichita, Kan., Delmer C. Gowing, III, Honigan, Miller, Schwartz & Cohn, West Palm Beach, Fla., for defendant.

## MEMORANDUM DECISION

BELOT, District Judge.

This case is ready for decision on the issue of damages. The court entered partial summary judgment against defendant Lodgistix, Inc. (Lodgistix) on the issue of liability by its Memorandum and Order dated August 1, 1991 (Doc. 45). 772 F.Supp. 540. Lodgistix' motion for reconsideration was denied on September 10, 1991 (Doc. 49). 1991 WL 192113. A trial to the court was held on April 14, 1992. An additional evidentiary deposition was held on May 21, 1992. Thereafter, the parties submitted their proposed findings of fact and conclusions of law.

## FINDINGS OF FACT

1. This case arises out of allegations of plaintiff, Sharp Electronics Corporation (Sharp), that Lodgistix breached its contractual obligations arising out of certain purchase orders placed with Sharp. The parties have stipulated that this court has jurisdiction of the parties, that all proper necessary and indispensable parties are joined, that venue is properly laid and that the law of Kansas governs. (Pretrial Order).

2. On December 3, 1987, Lodgistix, through its agent, Preferred Technologies, ordered 10,000 base band tuner kits, according to the following delivery schedule: 1,000 units on March 3, 1988; 3,000 units on April 1, 1988; 5,000 units on April 15, 1988; and 1,000 units as "safety stock" for which no delivery date was scheduled. Lodgistix previously had provided Sharp with evidence of Lodgistix' creditworthiness. (August 1, 1991 Memorandum and Order; Plaintiff's Exhibit 1).

3. The base band tuner kit designed and ordered by Lodgistix (designated by Sharp as Model R0061) consisted of three component parts: the up-down tuner, the demodulator and the modulator. The contract price of the kit to Lodgistix was $36.00. (Tr. p. 15).

4. The component parts of the kit, with additional electronic capacitor changes, were pretuned to one another in Japan. The completed kit was different from any other offered by Sharp. Certain aspects of the individual components of each kit (the up-down tuner, the demodulator and the modulator), were themselves unique because of Lodgistix' specifications. While it was technically possible to sell the components individually, each kit would have to be disassembled and certain modifications or adjustments would have to be made to the components before they could be resold. (Tr. pp. 11–12, 15, 54, 88, 98–99, 103–107; Manton depo. pp. 10–11, 24–25; Sharp's Exhibits 40 and 41).

5. On February 11, 1988, Lodgistix' agent ordered 10,000 remote control transmitter units. The remote control transmitter had a face plate with "Innvision" written on it. The "Innvision" transmitters had a different code from transmitters manufactured for other customers. (August 1, 1991 Memorandum and Order; Tr. p. 13; Plaintiff's Exhibit 2).

6. On or about March 22, 1988, Sharp's agent gave notice to Sharp to cancel delivery of the balance of the units to be shipped. This action was apparently prompted by notice given by Lodgistix to

Sharp's agent on or about March 17 that Lodgistix intended to cancel the purchase orders. At this time, only 1,000 tuner kit units had been received by Lodgistix.. (August 1, 1991 Memorandum and Order).

7. By letter dated April 1, 1988, Lodgistix formally notified Sharp that Lodgistix was cancelling all further purchases, and that it would not accept delivery of the existing 9,000 base band tuner kits. (August 1, 1991 Memorandum and Order).

8. 9,000 kits and 4,400 remote control transmitters were assembled and in existence at the time Lodgistix cancelled its order. (August 1, 1991 Memorandum and Order).

9. On May 11, 1988, Sharp notified Lodgistix that the tuner kits and remote control units were for Lodgistix' special purpose and custom manufactured, and therefore did not have commercial value to third parties. (Sharp's Exhibit 5).

10. On or about May 20, 1988, Terry Manton and Sam Yasuda of Sharp came to Wichita to meet with Nelson Tucker and others at Lodgistix. At the time of the meeting, Sharp did not have any existing customers using the base band tuner kits or the remote control transmitters. Its position was that it had custom made the units for Lodgistix and Lodgistix would have to take them. Lodgistix' position was that it knew a lot more people than Sharp did in that marketplace and would be able to find a buyer. Two alternative resolutions were discussed: (1) Sharp would make a proposal to reconfigure the units in another product to be built to Lodgistix' specifications and (2) Sharp and Lodgistix would work together to sell the existing kits and transmitters. (Tr. pp. 18–19).

11. The two alternatives were pursued simultaneously into at least the late fall of 1988. However, before this law suit was filed on February 6, 1989, Lodgistix determined that because of both timing and costs, modification of the already-manufactured units was not a viable option. (Tr. pp. 169–173).

12. On June 27, 1988, Sharp invoiced Lodgistix for payment of tuner kits in the sum of $324,000 and for payment of the transmitters in the sum of $26,864.40. (Sharp's Exhibits 7 and 8).

13. Subsequent to the May 1988 meeting, Terry Manton of Sharp and Nelson Tucker of Lodgistix had a telephone conversation about how Sharp's loss would be allocated in the event the components were sold to a third party. At the time of the conversation, Tucker thought he might have a buyer (Hotel Movie Theatre) for the kits at $26 each. Manton indicated that Sharp would be willing to "share the pain" with Lodgistix. Manton described the following scenario: assuming Lodgistix came to Sharp with a buyer willing to purchase the parts at $26, "... in the spirit of keeping it out of the courts and going through all this we'd [Sharp] be willing to split the difference on what they [Lodgistix] ordered them at and the $26 at that time. The discussion went on a little further that, okay, if this one doesn't come through and it's in that range, yeah we'll share it. So it wasn't limited to one individual part (sic) but it was limited to that ballpark." It was Tucker's understanding that Sharp would consider splitting a deficiency on any sale of the goods. The Hotel Movie Theatre sale never took place. (Tr. pp. 21, 65–67; 168).

14. Lodgistix suggested other potential buyers to Sharp. In fact, Nelson Tucker testified that he spent 50% of his time trying to chase down leads for the kits. The potential buyers were contacted by either Lodgistix or Sharp, and none of them were interested in purchase. Sharp contacted all leads given to it by Lodgistix. (Tr. pp. 19–21, 67, 84–85, 148; Manton depo., p. 7).

15. In January of 1989, Lodgistix informed Sharp of the existence of a potential third-party buyer of the goods named Image Stream, located in Hamilton, Ontario, Canada. (Tr. pp. 26–27).

16. On January 10, 1989, a meeting took place at Image Stream's office. Attendees were David Gagne and Sam Utaka of Sharp and Roger Keith of Hi–Tech Sales, Sharp's authorized independent sales representative, Nelson Tucker of Lodgistix,

and Michael Seebeck and Tom Costentino of Image Stream. (Sharp's Exhibit 42).

17. Image Stream was in the business of hotel distribution systems, similar to Lodgistix. Image Stream was a three man company; it had one engineer, a president and another person who was "chief cook and bottle washer." At the meeting, Sharp suggested pricing of the base band tuner kits at $32 per kit, and as part of the same package, there was a discussion that Sharp include in the package additional and unrelated Sharp products, specifically, a certain amount of static RAM (or "S RAM" components). There was no agreement when Sharp's representatives left as to supply of the static RAMs, except that Sharp would look into it. (Gagne depo., pp. 19–21).

18. At the same meeting, Gagne expressed his concern with Image Stream's creditworthiness. Gagne testified regarding those discussions as follows:

I asked them how they planned to do this business. It looked to me like a very small company, and we were talking about some very large dollars business, and they stated that they had a quarter million dollar line of credit with their bank. I asked them how much of that was available. They did not know or did not want to state anything at the time. We continued to discuss how we could do business, what kind of credit terms were could have. I offered either a standby letter of credit or an irrevocable letter of credit. Michael Seebeck said that he would be perfectly willing to do business by a standby letter of credit and I said that would be fine. A standby letter of credit was supposed to be set up, and it has still not today to date been set up.

(Gagne depo., p. 25–26).

19. Creditworthiness of a potential buyer was a key concern for Sharp. It was customary for Sharp to confirm creditworthiness of a buyer who had never purchased from Sharp, just as it had confirmed Lodgistix' creditworthiness before entering into the deal regarding the tuner kits and transmitters. However, no special credit restrictions or limitations were placed regarding the *resale* of the kits and transmit-

ters; if anything, the credit department was less restrictive. Nevertheless Sharp made the decision based upon information submitted to it by Image Stream that Image Stream would not be permitted to purchase on open credit. (Tr. pp. 32 and 131; Gagne depo., p. 28–32; Manton depo., p. 6).

20. Subsequent to the January 10, 1989 meeting, Sharp, primarily through its authorized sales representative, Hi–Tech Sales Company ("Hi–Tech"), which later became Indigo Electronics, regularly monitored the Image Stream account. Sharp's Exhibits 16 and 17 are the call reports reflecting Hi–Tech's contacts with Image Stream. (Manton depo., p. 5).

21. On January 24, 1989, Hi–Tech's call report stated that the "prototype" would be done in "March—April" with a 70% confidence level. (Sharp's Exhibit 16).

22. On January 27, 1989, Hi–Tech, on Sharp's behalf, forwarded a quote to Image Stream, offering the base band tuner kits at $32 per kit, along with the inclusion of certain other Sharp parts. Image Stream never responded in writing or otherwise to the Sharp quotation. Further, no standby letter of credit was ever posted by Image Stream. (Tr. p. 31; Gagne depo., p. 26; Sharp's Exhibit 24).

23. On February 2, 1989, Hi–Tech's call report noted discussions with Image Stream and stated "order to come in today via FAX." No order came. (Sharp's Exhibit 16).

24. On February 21, 1989, Hi–Tech noted Image Stream's credit application discussed, with Image Stream noted as a "cash in advance system." (Sharp's Exhibit 16).

25. On March 13, 1989, Hi–Tech's call report stated that "production start up April 10/89 ... pushed out to May/June time periods." Gagne testified this notation "[refers] to the Sharp tuner or RF kit ... instead of April production, as discussed during our meeting on January 10th, it was pushed out to the May, June time frame." Gagne further testified:

Now, every time since we have called on this account since then, this has been the

story. We'll give you an order in June, and June comes, it's pushed out to whatever, today. It's still sitting in the air the same way. A year and four months later, they still have no requirement for them.

(Gagne depo., p. 35; Sharp's Exhibits 16 and 46).

26. On March 30, 1989, Hi–Tech's call report stated "Image Stream looking at changing configuration to get away from allocation problem." (Sharp's Exhibit 16).

27. On September 14, 1989, Hi–Tech contacted Image Stream to "find status of order." (Sharp's Exhibit 16).

28. On September 19, 1989, Hi–Tech contacted Image Stream to "discuss Sharp tuners." Hi–Tech notes "technical problems with tuner; 10K 3–4 months start-up; 4 months for re-design." (Sharp's Exhibit 16).

29. Sharp, at Image Stream's request, had shipped a very small amount of goods to Image Stream on a COD basis. These goods were unrelated to the kits. This was done as an exception to Sharp's normal credit policies. On October 20, 1989, Sharp received notice that these goods were being returned to Sharp "for credit reasons; cash-in-advance account. Customer refused shipment. Sitting up at UPS (border)." Image Stream never paid for these goods. (Tr. pp. 32 and 33; Sharp's Exhibit 15).

30. On October 26, 1989, Hi–Tech again contacted Image Stream, and noted "discuss status on Sharp RF tuners, no change, no answers to whether Sharp will be used on hotel system." (Sharp's Exhibit 16).

31. On February 8, 1990, Hi–Tech contacted Image Stream to discuss Sharp. Image Stream requested "10 pcs. samples of GPIU501X to evaluate again." This referred to light detecting units, unrelated to the original Lodgistix goods. The February 8, 1990 call report further stated "this order was cancelled; will re-order part when schedule is available. No idea when or quantities. No status on other Sharp RF components." (Sharp's Exhibits 14 and 16).

32. On March 26, 1990, Hi–Tech again contacted Image Stream. The call report noted "engineering still evaluating Sharp RF tuner. No idea when they will make decision." (Sharp's Exhibit 16).

33. On April 25, 1990, Hi–Tech contacted Image Stream and reported "no news on Sharp tuners." (Sharp's Exhibit 16).

34. On April 27, 1990, Indigo Electronics (formerly Hi–Tech) contacted David Gagne and wrote as follows:

I am forecasting 0% confidence rate of doing business with Image Stream in 1990.... I will continue to support Image Stream, but I am very doubtful if Sharp will ever do business with Image Stream.

(Sharp's Exhibit 17).

35. Even at the time of Gagne's deposition on May 3, 1990, Gagne testified that he was still attempting to obtain a sale of kits to Image Stream. (Gagne depo., p. 37).

36. Gagne approached every customer in his territory who would be interested in the parts. His region included upstate New York, New England and all of Canada. Gagne stated that there were only three or four customers in his territory who might use the up/down tuner component or the demodulator and 15 customers who might use the RF modulator, but none of them used a single input RF modulator. Rather, everyone used double input, PC board mount type RF modulators. Thus, there was a very limited market to resell either the remote control transmitters or the base band tuner kits. (Gagne depo., pp. 6–7, 51, 55–57).

37. On September 6, 1989, Sharp sent letters to Spectradyne, Nexus Engineering, Cableshare, ISS Engineering, Catel and Norsat, notifying them of the tuner kit inventory as well as the three individual components and offered them at a reduced price of $25 each. The only response was from Norsat, which stated "the components would only provide value to us at a cost of less than $10." (Sharp's Exhibits 19–24 and 28).

38. On September 6, 1989, Sharp sent letters to Norsat, Cableshare and Comput-

er Accessories, notifying them of the remote control transmitters and offered them at a best reasonable offer. Again, only Norsat responded, and offered $3 per unit. (Sharp's Exhibits 25–27 and 30).

39. On October 6 and 17, 1989, respectively, Sharp gave Lodgistix written notice of its intent to resell the tuner kits and transmitters. (Sharp's Exhibits 29 and 31).

40. On June 27, 1990, Norsat purchased 4,153 remote control transmitters at the price of $2.50 per remote. The total purchase price was $10,382.50. (Sharp's Exhibits 34 and 35).

41. Sharp continued its efforts to resell the base band tuner kits. It sought to make absolutely certain that it had grasped at every straw at which it could possibly grasp. Sharp located a potential buyer called Astro Products of San Marcos, California. On July 25, 1990, Sharp quoted to Astro Products the sale of 8,974 kits at $28.00 per kit; the remotes were offered at $8.00 each. A condition of the sale was the posting of a standby letter of credit. (Sharp's Exhibit 38).

42. On February 1, 1991, one of Sharp's product engineers wrote Sharp's regional representative in California, stating that "Astro Products was given 6 months to prove their intent to buy by showing Sharp they could/would pay." Astro Products failed to do so. No standby letter of credit was posted and Astro Products did not pass Sharp's credit check. (Tr. pp. 118–119).

43. At this point, Triple Crown of Mississauga, Ontario, Canada became interested in purchasing the tuner kits commencing March 12, 1991. Triple Crown purchased 8,950 kits at $9.00 per kit for a total purchase price of $80,550.

44. In the March—April 1988 time frame, the time of breach, Sharp knew that it would be an uphill battle to get anything substantial out of the kits and transmitters. The only evidence was that the market value of the goods at the time of the breach was about the same as what the goods ultimately sold for: $9.00 each for the kits and $2.50 each for the transmitters. The same was true in the January,

1989 time frame at or about the time Lodgistix decided not to use the goods in a newly designed system and in the September—October 1989 time frame when Sharp gave notice to Lodgistix of its intent to dispose of the goods on resale. (Manton depo. pp. 13–14).

## CONTENTIONS OF THE PARTIES

Sharp proceeds under three sections of Uniform Commercial Code—Sales. Sharp contends, first, that it is entitled to recover the full contract price, less resale, pursuant to § 2–709 since the goods were identified to the contract and Sharp was unable after reasonable efforts to resell the goods at a reasonable price. Second, Sharp contends it is entitled to recover the difference between the market price at the time and place of tender and the unpaid contract price pursuant to § 2–708. Sharp asserts that even if the market price cannot be determined, the eventual resale price may be substituted for market price. Third, Sharp contends that it is entitled to recover the difference between the contract price and the resale price pursuant to § 2–706 because the eventual sale of the goods was conducted in good faith and in a commercially reasonable manner.

Lodgistix responds that Sharp failed to sell the goods in a commercially reasonable manner and therefore is precluded under relief under § 2–706 or § 2–709. Lodgistix also responds that Sharp failed to prove the market price of the goods at the time and place of tender and therefore cannot recover under § 2–708. Therefore, Lodgistix claims that Sharp is entitled to no damages of any kind, notwithstanding Lodgistix' breach of the contract.

## APPLICABLE STATUTES

K.S.A. 84–2–703 provides, in pertinent part:

**Seller's remedies in general.** Where the buyer wrongfully rejects or revokes acceptance of goods or fails to make a payment due on or before delivery or repudiates with respect to a part or the whole, then with respect to any goods

directly affected and, if the breach is of the whole contract (section 84–2–612), then also with respect to the whole undelivered balance, the aggrieved seller may

*   *   *   *   *   *

(d) resell and recover damages as hereafter provided (section 84–2–706);

(e) recover damages for nonacceptance (section 84–2–708) or in a proper case the price (section 84–2–709);

The Kansas Comment regarding § 703 observes:

"This section indexes all of the various remedies open to a seller for any breach by the buyer. The Code rejects any doctrine of election of remedy as a fundamental policy and thus the remedies listed are essentially cumulative in nature. Under 84–1–106, the Code requires its remedies to be liberally administered."

K.S.A. 84–2–706 provides, in pertinent part:

**Seller's resale including contract for resale.** (1) Under the conditions stated in section 84–2–703 on seller's remedies, the seller may resell the goods concerned or the undelivered balance thereof. Where the resale is made in good faith and in a commercially reasonable manner the seller may recover the difference between the resale price and the contract price together with any incidental damages allowed under the provisions of this article (section 84–2–710), but less expenses saved in consequence of the buyer's breach.

(2) Except as otherwise provided in subsection (3) or unless otherwise agreed resale may be at public or private sale including sale by way of one or more contracts to sell or of identification to an existing contract of the seller. Sale may be as a unit or in parcels and at any time and place and on any terms but every aspect of the sale including the method, manner, time place and terms must be commercially reasonable. The resale must be reasonably identified as referring to the broken contract, but it is not necessary that the goods be in existence or that any or all of them have been identified to the contract before the breach.

(3) Where the resale is at private sale the seller must give the buyer reasonable notification of his intention to resell.

*   *   *   *   *   *

K.S.A. 84–2–708 provides:

**Seller's damages for nonacceptance or repudiation.** (1) Subject to subsection (2) and to the provisions of this article with respect to proof of market price (section 84–2–723), the measure of damages for nonacceptance or repudiation by the buyer is the difference between the market price at the time and place for tender and the unpaid contract price together with any incidental damages provided in this article (section 84–2–710), but less expenses saved in consequence of the buyer's breach.

(2) If the measure of damages provided in subsection (1) is inadequate to put the seller in as good a position as performance would have done then the measure of damages is the profit (including reasonable overhead) which the seller would have made from full performance by the buyer, together with any incidental damages provided in this article (section 84–2–710), due allowance for costs reasonably incurred and due credit for payments or proceeds of resale.

K.S.A. 84–2–709 provides, in pertinent part:

**Action for the price.** (1) When the buyer fails to pay the price as it becomes due the seller may recover, together with any incidental damages under the next section, the price

*   *   *   *   *   *

(b) of goods identified to the contract if the seller is unable after reasonable effort to resell them at a reasonable price or the circumstances reasonably indicate that such effort will be unavailing.

(2) Where the seller sues for the price he must hold for the buyer any goods which have been identified to the contract and are still in his control except that if resale becomes possible he may resell them at any time prior to the collection of the

judgment. The net proceeds of any such resale must be credited to the buyer and payment of the judgment entitles him to any goods not resold.

K.S.A. 84–2–723 provides:

**Proof of market price: Time and place.** (1) If an action based on anticipatory repudiation comes to trial before the time for performance with respect to some or all of the goods, any damages based on market price (section 84–2–708 or section 84–2–713) shall be determined according to the price of such goods prevailing at the time when the aggrieved party learned of the repudiation.

(2) If evidence of a price prevailing at the times or places described in this article is not readily available the price prevailing within any reasonable time before or after the time described or at any other place which in commercial judgment or under usage of trade would serve as a reasonable substitute for the one described may be used, making any proper allowance for the cost of transporting the goods to or from such other place.

(3) Evidence of a relevant price prevailing at a time or place other than the one described in this article offered by one party is not admissible unless and until he has given the other party such notice as the court finds sufficient to prevent unfair surprise.

## CONCLUSIONS OF LAW

### *K.S.A. 84–2–709*

While Sharp seeks the cumulative remedies available under § 2–703, it is apparent from its briefs that its first choice is § 2–709 which allows for recovery of the contract price less a credit for goods sold prior to collection of the judgment. Lodgistix responds that Sharp is not entitled to recover under § 2–709 because it did not sell the goods in a commercially reasonable manner. However, Lodgistix has failed to discuss § 2–709 in its briefs and has offered no authority in support of its position.

The initial question, which the parties have not addressed, is whether § 2–709

applies under the facts of this case. A starting point is the Kansas Code Comment found in Vernon's Kansas Statutes Annotated:

The usual remedy for breach of a sales contract will be the recovery of damages under either § 84–2–706 or § 84–2–708, recovering on either the difference between resale price and contract price or the difference between contract price and market price at the time and place of tender. This section has a restricted use and the circumstances under which an action for the entire contract price may be allowed are carefully stated. An action for the price is, in effect, the seller's remedy of specific performance.

Prior Kansas law has recognized the seller's right to recover the contract price upon the buyer's acceptance of the goods. Peabody School Furniture Co. v. Steel Fixture Mfg. Co., 1928, 125 Kan. 278, 265 [264] P. 27 [1928]. Also see other state decisions in the following Notes of Kansas Decisions.

### Subsection (1)

Three basic situations will allow the seller to maintain a price action. First, if the goods have been accepted by the buyer and no justifiable revocation of acceptance has taken place. The seller, having fully performed his obligations under the contract, may demand the buyer's reciprocal performance.

The second portion of paragraph (a) also allows recovery of the price if conforming goods are lost or damaged within "a commercially reasonable time" after risk of loss had passed to the buyer. Location of title, highly significant under prior law, has no effect upon the right to bring an action for the price under the Code.

Paragraph (b), in describing the third set of circumstances under a price action can be brought, requires the seller to show that either he has made a reasonable effort to sell identified goods without success or the circumstances reasonably indicate that any attempt to resell the identified goods would be unavailing. In

essence the seller must act in a commercially reasonable manner as a prerequisite to asserting his claim for the full purchase price.

### Subsection (2)

One result of instituting a price action is the seller's duty to hold identified goods for the buyer. In further emphasizing the primary remedy of reselling the goods, the seller may exercise the right of resale at any time prior to collection of the judgment, crediting any sale proceeds to the buyer's account. Payment of the judgment entitles the buyer to any goods not sold.

### Subsection (3)

Failure to succeed in the action for the contract price will not prevent the unsuccessful seller from bringing an action for damages. The cumulative nature of remedies under § 84–2–703 allows the seller to bring an action under § 84–2–708 after his action for the price fails. Under § 60–208 of the Kansas Code of Civil Procedure pleading the two claims in the alternative would be permissible.

While the Comment does not answer the question directly, it certainly suggests that § 2–709 may not be favored under the facts of this case where the goods have been sold to a third party. This conclusion seems to be reinforced by *Desbien v. Penokee Farmers Union Cooperative Association*, 220 Kan. 358, 552 P.2d 917 (1976).

Certain facts of *Desbien* are fairly analogous to this case. Three sets of farmers contracted with the co-op to purchase their wheat. The Desbiens had delivered their wheat to the co-op but the co-op refused to honor the contract and pay for the wheat. The other farmers (Clark, Pennington, Johnson and Stephen) had not delivered their wheat. In considering the claims of the Desbiens, the court said, at p. 367 of the opinion:

The Desbiens under the contract were entitled to be paid for their wheat on the agreed day of payment, January 1, 1974, in the case of Stanley and Eugene Desbien or January 31, 1974, the date of payment specified in the contract of Arthur Desbien. When a buyer of personal property fails to pay the agreed purchase price when due the seller may recover the agreed price of the goods with interest from the date payment was due until the proper amount is actually tendered to the buyer. (K.S.A. [Weeks 1965] 84–2–709.)

However, when considering the claims of farmers Clark, Pennington, Johnson and Stephen, the court stated, at p. 369:

The trial court held, however, that the Coop by failing to pay the purchase price when due breached the contracts. Under the circumstances the correct measure of damages to be applied was the difference between the market price at the time and place for tender and the unpaid contract price. In some cases incidental damages are also recoverable but they are not involved in this case. This measure of damages is adopted in K.S.A. 84–2–708 and by a number of Kansas cases prior to the enactment of the Uniform Commercial Code. (Neiswender v. Bolen, 113 Kan. 271, 214 Pac. 96 [1923]; and Rock v. Gaede, 111 Kan. 214, 207 Pac. 323 [1922].) It should also be noted that under K.S.A. 84–2–703, where the buyer breaches a sales contract by failing to make payment when due on or before delivery, a seller may retain possession of the goods and resell them and recover damages from the buyer where the sale price of the wheat was less than the purchase price provided for under the contract. (International T. & R. Corp. v. Benscheidt, 141 Kan. 416, 41 P.2d 737 [1935]; Hayes v. Cardwell, 107 Kan. 556, 192 Pac. 757 [1920].)

The court went on to point out that the four farmers had not suffered any damages because the price of wheat at the time of the breach was double the contract price. This fact, however, does not detract from the central holding: that when the seller still has possession of the goods and the goods are resalable (or have been resold), the seller's principal remedy is not under § 2–709.

The only other Kansas decision in which § 2–709 is cited is *Wendling v. Puls,* 227 Kan. 780, 610 P.2d 580 (1980). However, the cite is only § 2–709's subreference in K.S.A. 84-2-703. There is no substantive discussion of § 2–709 in the opinion.

In this diversity action, the court must follow Kansas law. The court believes that Kansas law would not allow a seller to recover under § 2–709 when, as here, the seller has resold the goods and when other remedies are available to make the seller whole. This is consistent with the general rule regarding U.C.C. Section 2–709. W.H. Henning and G.I. Wallach, THE LAW OF SALES UNDER THE UNIFORM COMMERCIAL CODE, ¶ 8.03.

### K.S.A. 84–2–708

Sharp's second choice appears to be § 2–708(1), which allows for recovery of the difference between the market price of the goods at the time of tender and contract price. Lodgistix responds that Sharp may not recover under § 2–708(1) because it failed to prove market price.

Once again, this court is obligated to follow Kansas law, which, like the law interpreting § 2–709, is sparse. The original Kansas Code Comment states:

Subsection (1)

A seller failing to meet the requirements on resale of goods under § 84-2-706 will have his measure of damages established by this subsection under most situations. As was indicated in the Kansas Code Comment to § 84-2-706; the aggrieved seller, reselling the goods for a price higher than the market value, may still sue for the difference between market price and the unpaid contract price at the time and place of tender. Incidental damages and cost savings are other factors of considerations in assessing damages against the seller.

The "time and place of tender" will determine the relevant market value and reference should be made to Part 5 of this Article, particularly § 84-2-503, on the manner of seller's tender of delivery. The method of assessing damages contained herein is consistent with Kansas

pre-Code decisions. See Neiswender v. Bolen, 1923, 113 Kan. 271, 214 P. 96, and other cases under the Index to Kansas Decisions.

The 1983 Comment adds:

This section provides the seller with an alternative to resale in fixing the amount of damages for buyer's breach. Under subsection (1), the seller may elect to compute damages on the basis of the market price at the time and place for tender. This is in accord with prior Kansas law. See Neiswender v. Bolen, 113 K. 271, 214 P. 96 (1923). The operation of subsection (1) is illustrated by Wendling v. Puls, 227 K. 780, 610 P.2d 580 (1980). This case also permitted the aggrieved seller to recover market damages under this section even though the seller had resold, and resale damages under 84-2-706 would have been smaller.

Only four Kansas cases discuss § 2–708. Two of the cases are not helpful in determining the applicability of § 2–708 in this case: *Kvassay v. Murray,* 15 Kan.App.2d 426, 808 P.2d 896 (1991) and *Stanturf v. Quality Dodge, Inc.,* 3 Kan.App.2d 485, 596 P.2d 1247 (1979).

In *Desbien, supra* 220 Kan. at p. 369, 552 P.2d 917, the court held that the proper measure of damages for the farmers whose wheat was never delivered to the co-op was the difference between the market price at the time and place of tender and the unpaid contract price. The court observed: "This measure of damages is adopted in K.S.A. 84-2-708 and by a number of Kansas cases prior to the enactment of the Uniform Commercial Code." The requirements for proving market price were not discussed in *Desbien,* undoubtedly because the price of the goods (wheat) was so readily obtainable.

The latest case is *Wendling, supra.* In *Wendling,* the buyer and seller contracted for the sale of cattle at a specific price and as of a specific future date. The date came and the buyer did not perform. The seller did not sell the cattle. Instead, he sued the buyer for the difference between the contract price and the price of the cattle at a

different and later date than the one in the contract. Because the cattle had not been sold, the seller established their market value through the testimony of a qualified cattle buyer. The court found for the seller.

The buyer defendant appealed and claimed that the value of the cattle should have been as of the date selected by the parties at the time they made the deal, not the later date unilaterally selected by the seller. The Supreme Court disagreed and observed:

> The trial court found the seller was not under a resale obligation and the fact that he did later resell the cattle did not bear on his ability to elect his damage remedy pursuant to K.S.A. 84–2–708. Plaintiff was granted judgment against defendants in the amount of $14, 755.02, plus interest and costs. Appellants Puls and Watson appeal.
>
> Appellants' first issue pertains to a construction of K.S.A. 84–2–708. They question whether the statute permits the seller to select a tender of delivery date where the contract is uncertain and treat the selected date for fixing damages upon the buyer's failure to respond. In raising the issue, appellants admit the contract of sale, its terms and the proposed delivery date. The Uniform Commercial Code is to be liberally construed (K.S.A. 84–1–102) and every duty within the act imposes an obligation of good faith in its performance. (K.S.A. 84–1–203). K.S.A. 84–1–204 provides that a reasonable time for taking action depends on the nature, purpose and circumstances of such action.

> \* \* \* \* \* \*

It is clear the correct measure of damages is "the difference between the market price at the time and place for tender and the unpaid contract price" Desbien v. Penokee Farmers Union Cooperative Association, 220 Kan. 358, 369, 552 P.2d 917 (1976). See Neiswender v. Bolen, 113 Kan. 271, 214 Pac. 96 (1923); Rock v. Gaede, 111 Kan. 214, 207 Pac. 323 (1922). Appellants argue the Desbien case supports their contention the delivery date

agreed upon by the parties, August 23, 1973, is the correct date from which to measure damages.

Giving K.S.A. 84–2–708(1) a liberal construction in the absence of any evidence of bad faith, did the nature, purpose and circumstances of this case justify Wendling's act of setting the tender date as of September 21, 1973? We believe that action was proper in this case. Wendling advised Puls and Watson he did not feel free to sell the livestock without a written release. Appellants made no response. Wendling advised Watson of a proposed meeting of all parties, to be held in his lawyer's office for the purpose of obtaining a written release. Neither appellant replied and neither appeared at the appointed time. Wendling then sent the notice on September 11, 1973, to both appellants fixing the "tender" date at September 21, 1973, giving appellants 10 days to respond. They again chose to make no response. At the time the contract was not clearly in breach and the delivery date remained uncertain. "(1) Tender of delivery requires that the seller put and hold conforming goods at the buyer's disposition and give the buyer any notification reasonably necessary to enable him to take delivery." K.S.A. 84–2–503(1). The Official Comment following this section of the Code states: " 'tender' connotes such performance by the tendering party as puts the other party in default if he fails to proceed in some manner." Considering the letter and spirit of the Code, we find appellee's actions were made in good faith and were commercially reasonable under the nature and circumstances of this case. The damages were properly set as of September 21, 1973.

■ Neither Sharp nor Lodgistix mention *Desbien* or *Wendling* so the court will have to proceed without the benefit of the parties' views regarding their applicability to this case. Applying *Desbien* and *Wendling* to the particular facts of this case, the court finds that while the market value of the goods must be fixed at the time and place of tender, the continuing negotiations

between the parties regarding whether or not Lodgistix would take the goods allows the date of tender to "float" between the time of the breach (March, 1988) and the point when Lodgistix decided not to use the parts in a newly designed system (January, 1989).

■ The next question which must be answered is whether Sharp's proof of market price was acceptable under K.S.A. 84–2–723. The only evidence of market price of the goods came from Terry Manton, Sharp's Director of Sales (see finding of fact No. 44). The court finds his testimony admissible under § 2–723(2) as Manton's "commercial judgment." Lodgistix made no effort to challenge or object to Manton's testimony nor did it offer any contrary evidence. Courts are given "reasonable leeway" in determining market price (Official Comment, § 2–723). See also *Sprague v. Sumitomo Forestry*, 104 Wash.2d 751, 709 P.2d 1200, 1205 (1985).

■ Finally, the court must determine whether, having proved market price, Sharp is entitled to recover under § 2–708(1). The court concludes that while resale of the goods is not a *per se* bar to recovery under § 2–708, it is under the particular facts of this case.

First, for the reasons stated in the following section, Sharp can recover under § 2–706. The Kansas Comment, *supra*, makes it clear that recovery under § 2–708(1) is triggered only when a seller fails to meet the resale requirements of § 2–706.

Second, § 2–708 is a cumulative remedy and although it might be applicable if Sharp had sought to recover incidental damages under § 2–708(1) or consequential damages under § 2–708(2), it is not available because Sharp has not sought such damages.

Third, as a practical matter, Sharp's recovery under § 2–708(1) and § 2–706(2) is the same because the market price of the goods is the same as the resale price.

### K.S.A. 84–2–706

■ The final section relied upon by Sharp is § 2–706 which allows recovery of the difference between the contract price and the resale price. Lodgistix claims that there can be no recovery under § 2–706 because the sale of the goods was not "commercially reasonable." The court finds Lodgistix' position to be untenable.

The Kansas Comment regarding § 2–706 reads:

This section applies in cases involving any breach or anticipatory repudiation by the buyer. It allows damages to be set precisely by fixing them as against the resale price rather than a nebulous market price. This right was recognized in Kansas in pre-Code cases. See Hayes v. Cardwell, 107 K. 556, 192 P. 757 (1920); International Trading & Rice Corp. v. Benscheidt, 141 K. 416, 41 P.2d 737 (1935). Under this section, the seller resells on his own behalf as a remedial right by authority of law, and does so irrespective of whether title has passed. Under subsection (1), a proper resale entitles the seller to recover the difference between the resale price and the contract price, plus any incidental damages, but less any expense saved as a consequence of the buyer's breach.

Any resale under this section must be carried out with commercial reasonableness. The requirement of commercial reasonableness is spelled out in greater detail in subsections (2), (3) and (4). Under these provisions, the seller is given considerable flexibility. The requirements for seller's resale under this section are similar to the requirements for resale by a foreclosing secured creditor under 84–9–504.

■ Lodgistix argues that the sale of the goods was not "commercially reasonable" because it was not accomplished in a "timely" fashion after Sharp learned of the breach. Lodgistix' argument completely ignores the facts. First, the goods were not fungible. Second, the goods were custom made for what, at best, appears to be a rather limited industry. Third, while the goods could be separated into separate components, this required additional expense and even then, the goods were not much more saleable. Whether as a kit or

as individual components, it is apparent that there were few potential buyers for the goods. The best evidence of this is the testimony of Nelson Tucker, a Lodgistix employee, that he spent 50% of his time, apparently for several weeks or months, trying to find a buyer. Lodgistix cannot be heard to complain about Sharp's failure to consummate a quick resale when it could not do so, either. Moreover, at least one court has held that the "commercial reasonableness" standard does not include a time requirement for resale. *Serna, Inc. v. Harman*, 742 F.2d 186, 189 (5th Cir.1984).

Fourth, at least until January, 1989, Sharp had reason to believe that Lodgistix might still take the goods. Fifth, it was reasonable for Sharp to insist that potential buyers of the goods be able to pay for them. There is no evidence to support Lodgistix' claim that Sharp imposed unreasonable credit requirements on potential buyers of the goods. It is nonsense to suggest that Sharp was required by the standard of commercial reasonableness to protect Lodgistix by negotiating a sale to someone who ultimately could not pay for the goods.

For all these reasons, the court finds that the sales of the kits and transmitters were made in good faith and in a commercially reasonable manner. While a substantial period of time elapsed between the repudiation and the sales, the sales were nevertheless timely under the particular facts of this case. The only evidence is that Sharp obtained the highest possible price for the goods. Section 2–706 is the U.C.C.'s preferred remedy, *Henning and Wallach, supra,* ¶ 8.02, and its application in this case achieves the U.C.C.'s goal of placing the non-breaching party in the same economic position it would have occupied had the breach not occurred. See K.S.A. 84–1–106.

As a final point, the court found Sharp's witnesses more credible, and its evidence more persuasive, than the witness and evidence produced by Lodgistix. For example, Lodgistix' witness, Tucker, had considerable trouble with important dates. Tucker initially testified that Lodgistix made its decision regarding whether to reformulate the tuner kit within two months of the May, 1988 meeting. (Tr., p. 144). On cross examination, however, Tucker admitted that the decision was not made at least until October, 1988 (Tr., pp. 172–173). On another topic, Tucker stated that his "understanding" from his conversation with Terry Manton was that Sharp and Lodgistix would split 50/50 Sharp's loss on *any* resale of the goods. However, Tucker did not confirm this understanding with a letter. (Tr., pp. 147, 168). Tucker was unable to accurately recall the costs of the goods which were discussed at the meeting with Image Stream. (Tr., pp. 160–161).

The court has considered Tucker's lack of credibility particularly in connection with Lodgistix' claim that Sharp and Lodgistix agreed to a 50/50 split of any loss. While there was some discussion about such a split in connection with the unrealized Hotel Movie Theatre deal, it is clear that the discussion did not rise to the level of a specific agreement. It is also clear that the discussion was limited to the Hotel Movie Theatre deal and did not extend to any other sale of the goods. It is apparent from Manton's testimony that the consideration for any 50/50 split was an early sale which would obviate the expense and trouble of litigation. There was no meeting of the minds that the parties would split 50/50 on a loss resulting from a sale occurring after litigation had been commenced.

Accordingly, it is the court's intention to enter judgment in favor of Sharp and against Lodgistix in the amount of $380,-105.25, the amount set forth in Sharp's trial brief and suggested findings and conclusions. However, the court will withhold entry of judgment for 5 days in order that Lodgistix may submit any contrary calculation of the judgment amount. If it elects to do so, Sharp shall have five days to respond.

IT IS SO ORDERED.