**COOK COMPOSITES, INC. n/k/a Curran Composites, Inc., Total Composites, Inc., and Cook Composites and Polymers Co., Appellants,**

v.

**WESTLAKE STYRENE CORPORATION, Appellee.**

No. 14–98–01064–CV.

Court of Appeals of Texas, Houston (14th Dist.).

Jan. 20, 2000.

Andrew T. McKinney, IV, Kim A. Cooper, Houston, for appellants.

Bradley M. Whalen, Stephen Lee, Houston, for appellee.

Panel consists of Justices YATES, FOWLER and FROST.

## OPINION

KEM THOMPSON FROST, Justice.

This is a breach of contract case arising out of a written agreement between two companies for the purchase and sale of goods. At issue is the propriety of the trial court's granting of the seller's motion for summary judgment notwithstanding the buyer's assertion of various affirmative defenses, both under common law and arising under the Uniform Commercial Code.

### INTRODUCTION

The appellee, Westlake Styrene Corporation sued the appellants, Cook Composites, Inc. n/k/a Curran Composites, Inc., Total Composites, Inc. and Cook Composites and Polymers Co. (collectively, "CCP") for breach of contract. Initially, CCP filed a general denial and asserted the affirmative defense of estoppel. Westlake filed a traditional motion for summary judgment on its contract claim and a "no evidence" motion for summary judgment on CCP's affirmative defense of estoppel. Before this combined motion was set for submission, CCP amended its answer to add ambiguity, modification of contract, abandonment, waiver and failure to mitigate damages as affirmative defenses to Westlake's claim. The trial court granted Westlake's motion and entered final judgment in favor of Westlake for $1,337,777.50, plus post-judgment interest and attorney's fees.

CCP presents seven issues for appellate review. In the first six issues, CCP contends that the trial court erred by granting summary judgment because: (1) the contract is ambiguous; (2) genuine issues of material fact exist with respect to Westlake's entitlement to damages; (3) CCP raised questions of fact on its affirmative defenses; (4) Westlake failed to prove all elements of its *prima facie* case for recovery of damages under the Uniform Commercial Code ("UCC"), as adopted in Texas; (5) Westlake's motion for summary judgment failed to address several of CCP's affirmative defenses; and (6) Westlake anticipatorily repudiated the contract when it failed to provide adequate assurance of due performance, thereby excusing CCP's obligation to perform. In its seventh issue, CCP claims the trial court erred in setting the rate of pre-judgment interest too high. We affirm the decision of the lower court.

### FACTUAL BACKGROUND

In January of 1995, CCP and Westlake entered into a three-year contract for the purchase and sale of styrene monomer. Under the parties' contract, CCP agreed to buy a set quantity of product from Westlake through the end of 1997, at an agreed formula price. CCP was to purchase the product in equal monthly installments in the following volumes: (i) 12 million pounds in 1995; (ii) 14 million pounds in 1996; and (iii) 16 million pounds in 1997. Because the market price for styrene monomer fluctuates on a daily basis, the parties included in the contract a "meeting competition" clause in an effort to buffer the effects of market price movements. The clause reads in part:

> If Buyer [CCP] furnishes Seller [Westlake] satisfactory written evidence of a legitimate price, which is lower than Seller's effective price to buy, offered by a recognized domestic manufacturer on standard products of like quantity and quality on substantially similar terms and conditions, Seller agrees to meet such lower price on the base volume as long as such competitive offer is valid over the term of this contract.

In early 1995, CCP (buyer) advised Westlake (seller) of a competitive situation and produced written evidence in the form of a contract with Amoco, one of CCP's competitors. The Amoco contract was for a term at least as long as the Westlake/CCP contract. Westlake met the competitive situation by adopting the competitor's pricing formula as part of the Westlake/CCP contract.

In July and August of 1996, CCP, in response to a fall in the market price for styrene monomer, asked Westlake for a reduction in the contract price. The Westlake/CCP contract contained a discretionary clause which provided that Westlake, as seller, "at any time may lower its price or institute or remove a temporary voluntary allowance or other similar competitive allowance off the list price without being obligated to provide [CCP] with any advance notice thereof." Although Westlake did not meet the price CCP had requested, it granted CCP a price reduction.[1] Westlake required no written evidence from CCP before lowering the price.

In October of 1996, CCP attempted to invoke the "meeting competition" clause by producing a competitor's invoice for one shipment of styrene monomer for the month of October 1996. This invoice did not contain the terms and conditions of the offer, did not verify quantity, and did not contain evidence that the offer was valid over the term of the Westlake/CCP contract, all of which was information required by the contract. When CCP refused to provide any written evidence of the terms and conditions, quantity or term over which the allegedly competitive offer

---

1. CCP contends that Westlake made the price adjustment under the "meeting competition" clause. Westlake, however, insists that it was merely a temporary allowance granted under the discretionary clause.

was valid, Westlake refused to meet the price stated in the competitor's invoice.

Beginning in December of 1996, CCP refused to honor the Westlake/CCP contract formula price. Westlake filed suit against CCP for breach of contract. To mitigate its damages, Westlake sold the styrene monomer CCP had agreed to purchase on the spot market at prices well below the price specified in the Westlake/CCP contract. Westlake did not give CCP advance notice of the sale. At trial, the court found in favor of Westlake and awarded damages for the difference between the contract price and the spot market sales price, plus prejudgment and postjudgment interest and attorney's fees.

## STANDARD OF REVIEW

The party moving for summary judgment has the burden of showing that no genuine issue of material fact exists and that it is entitled to judgment as a matter of law. *See Nixon v. Mr. Property Management Co., Inc.,* 690 S.W.2d 546, 548 (Tex.1985). In deciding whether a disputed material fact issue precludes summary judgment, we take as true all evidence favoring the non-movant. *See id.* at 548–49. We review conclusions of law *de novo* and will uphold them if the judgment can be sustained on any legal theory supported by the evidence. *See National Environmental Service Co., Inc. v. Homeplace Homes, Inc.,* 961 S.W.2d 632, 634–35 (Tex. App.—San Antonio 1998, no pet.) (citing *Nelkin v. Panzer,* 833 S.W.2d 267, 268 (Tex.App.—Houston [1st Dist.] 1992, writ dism'd w.o.j.)).

## AMBIGUITY

In its first issue, CCP claims there are at least three ambiguities in the "meeting competition" clause which make the trial court's granting of Westlake's summary judgment motion improper. To support its argument, CCP offers various interpretations of the language in the clause.

■■■ At the outset, we note that conflicting interpretations of a contract and unclear and uncertain language do not necessarily mean a contract is ambiguous. *See Kelley–Coppedge, Inc. v. Highlands Ins. Co.,* 980 S.W.2d 462, 465 (Tex.1998); *Universal C.I.T. Credit Corp. v. Daniel,* 150 Tex. 513, 243 S.W.2d 154, 157 (1951); *Preston Ridge Fin. Servs. Corp. v. Tyler,* 796 S.W.2d 772, 777 (Tex.App.—Dallas 1990, writ denied). There are two steps to an ambiguity analysis. First, we apply the applicable rules of construction and decide if the contract is ambiguous. *See Coker v. Coker,* 650 S.W.2d 391, 393 (Tex.1983). A contract is not ambiguous if it can be given a certain and definite meaning or interpretation. *See id.* We must interpret an unambiguous contract as a matter of law. *See id.* If, however, the contract can be given two or more reasonable interpretations, it is ambiguous. *See Kelley–Coppedge,* 980 S.W.2d at 465. If we find contract ambiguous, the second part of the ambiguity analysis comes into play and the trier of fact may consider the parties' interpretation and other extraneous evidence. *See National Union Fire Ins. Co. v. CBI,* 907 S.W.2d 517, 520 (Tex.1995); *Quality Oilfield Products, Inc. v. Michigan Mut. Ins. Co.,* 971 S.W.2d 635, 639 (Tex.App.—Houston [14th Dist.] 1998, no pet.). In that event, we must find that summary judgment is improper. An ambiguous contract raises a question of fact which cannot be disposed of on summary judgment. *See Calhoun v. Killian,* 888 S.W.2d 51, 54 (Tex.App.—Tyler 1994, writ denied).

■■■ In the first step of the ambiguity analysis, our primary concern is to determine and give effect to the intentions of the parties as expressed in the instrument. *See Coker,* 650 S.W.2d at 393; *Tyler,* 796 S.W.2d at 775. In determining the intention of the parties, we look only within the four corners of the agreement to see what is actually stated, and not at what was allegedly meant. *See Esquivel v. Murray Guard, Inc.,* 992 S.W.2d 536, 544 (Tex.

App.—Houston [14th Dist.] 1999, pet.denied). We must consider all of the provisions with reference to the entire contract; no single provision will be controlling. *See Coker,* 650 S.W.2d at 393; *Esquivel,* 992 S.W.2d at 543. In construing the contract, we consider how a reasonable person would have used and understood the language, by pondering the circumstances surrounding the contract's negotiation, and by considering the purposes which the parties intended to accomplish by entering into the contract. *See Manzo v. Ford,* 731 S.W.2d 673, 676 (Tex.App.—Houston [14th Dist.] 1987, no writ). We are free to examine prior negotiations and all other relevant incidents bearing on the intent of the parties; however, the parties may not contradict or vary the terms of the agreement by oral statements of their intentions. *See Sun Oil Co. (Delaware) v. Madeley,* 626 S.W.2d 726, 734 (Tex.1982); *Medical Towers, Ltd. v. St. Luke's Episcopal Hosp.,* 750 S.W.2d 820, 823 (Tex.App.—Houston [14th Dist.] 1988, writ denied). We look to these circumstances merely to assist us in understanding the object and purpose of the contractual language the parties chose. *See Garcia v. King,* 139 Tex. 578, 164 S.W.2d 509, 512 (1942); *St. Luke's,* 750 S.W.2d at 823. With these basic rules of contract construction and interpretation in mind, we now address each of the alleged ambiguities in the Westlake/CCP contract.

■ The first alleged ambiguity involves the "time-offered" component of the competitive offer. The "meeting competition" clause states that Westlake will meet the lower price on the base volume "as long as" the offer is good "over the term of this contract." To help define the meaning of this language, we look at comparable language in a related clause of the Westlake/CCP contract. The related clause, known as a "meet or release" clause, relates only to amounts over the base volume. This clause basically gives Westlake the option of either "meeting" the price or "releasing" CCP to purchase the product from the other source "while such lower price is in effect." The sentence immediately following this "meet or release" clause allows Westlake to become CCP's supplier again, if Westlake opted to release CCP, "for as long as it [the lower price] is in effect." We note that the parties used a key phrase "for as long as" in the "meet or release" provision, but *not* in the "meeting competition" provision, where they instead used the phrase "as long as." The logical effect of this word choice is that: (i) Westlake's *obligation* to supply at a lowered price could only be triggered "as long as" (meaning *if*) the lower offer covered a period of time at least as long as the Westlake/CCP contract; and (ii) Westlake's "meet or release" *option* could be triggered "for as long as it is in effect" (meaning for the life of the competitive offer however short it may be). The committed base volume required comparable commitment from the alternative supplier; the excess volumes did not. The selective use of the preposition "for" gives clear and definite meaning to this regime. Looking within the four corners of the agreement, the intent of the parties is clear: the time period "over the term of this contract" pertains to competitive offers longer than or equal to the remaining term of the Westlake/CCP contract, i.e., at least through 1997. Because this portion of the contract can be given a clear and definite meaning, the "time-offered" provisions are not ambiguous.

■ Next, CCP claims that because the contract failed to define what constitutes "satisfactory written evidence" of a "legitimate" styrene monomer price, the "meeting competition" clause is ambiguous. The terms "satisfactory" and "legitimate," as used in this context, are not ambiguous as a matter of law and, therefore, it is not necessary to look beyond the four corners of the contract to glean the parties' intent. Even if we were to do so, the only evidence CCP produced to show the parties' intent was the purported practice in the industry "simply to inform the seller of the competitive price." This "in-

dustry practice," however, is wholly inconsistent with the express terms of the Westlake/CCP contract, which, on its face, calls for *written* evidence.[2] Given this express term of the contract, we cannot conclude that Westlake and CCP intended to follow the stated "industry practice," nor can we find that the parties had two different intents when drafting the contract. Therefore, the evidence of "industry practice" is insufficient to create two reasonable interpretations of the contract's terms. We find that these terms are not ambiguous in this contract.

 Finally, CCP claims the phrase "valid over the term of the contract" is ambiguous. Again, by looking within the four corners of the Westlake/CCP contract, the parties' intention is clear: the competitive offer must be valid at least until the end of the Westlake/CCP contract. The general purpose of a "meeting competition" clause like the one at issue here is to obligate the seller to sell to the buyer at competitive prices offered for comparable quality, quantity, and duration. The purpose is not to allow the buyer to purchase from the seller at the spot market price in certain months when the spot price is lower than the contract price. If this were true, the seller would have all the price risk under the contract and the buyer would have none. The phrase "valid over the term of the contract" has a clear and definite meaning and is not subject to two reasonable interpretations. Because we find that the phrase is not ambiguous, we do not reach the second step of the ambiguity analysis (consideration of evidence of conflicting interpretations that CCP provided); rather, we interpret the phrase as a matter of law. We find that the commercial rationale for the "meeting competition" clause is sufficient to uphold the trial court's judgment as to the meaning of this provision of the contract. Having determined that there is no ambiguity

in the "meeting competition" clause, we overrule CCP's first issue.

## GENUINE ISSUES OF MATERIAL FACT

 In its second issue, CCP claims there are genuine issues of material fact that make the trial court's granting of Westlake's summary judgment motion improper. Specifically, CCP contends there existed two disputed fact questions as to whether CCP was excused from its obligation to pay the full formula price under the Westlake/CCP contract. These issues, both of which arise out of the "meeting competition" clause, are: (1) whether CCP provided Westlake "satisfactory written evidence of a legitimate price" and (2) whether the "competitive offer [was] valid over the term of this contract."

The "meeting competition" clause provides that CCP must furnish Westlake with satisfactory written evidence of a legitimate price which is offered by a recognized domestic manufacturer on standard products of like quantity and quality on substantially similar terms and conditions. Additionally, the contract specifies that the competitive offer must be valid over the term of the Westlake/CCP contract. CCP produced an invoice that contained the price of the product and the name of the manufacturer. CCP did not produce written evidence of a legitimate price of like quantity on substantially similar terms and conditions, and did not produce any evidence that the offer was valid over the term of the Westlake/CCP contract. CCP argues that (1) its production of the Amoco contract in early 1995 (before the parties signed the Westlake/CCP contract in dispute) was sufficient to satisfy the "written evidence" requirement, (2) Westlake knew the terms and conditions were substantially the same, and (3) the Amoco contract was valid over the term of the Westlake/CCP contract.

2. Because CCP never provided *any* written evidence of the terms and conditions of the competing offer, or of the duration of the competing offer, the trial court never had to reach the issue of what constituted "satisfactory" written evidence.

Although the Westlake/CCP contract does not specifically provide a time when the written evidence must be furnished, it is clear from the implicit "if/then" structure of the clause that the written evidence must be furnished when the "meeting competition" clause is invoked so as to enable Westlake (seller) the opportunity to confirm that the requirements for CCP (buyer) to be entitled to a lower price have been satisfied. By failing and refusing to produce the Amoco contract at the time it sought to invoke the "meeting competition" clause, CCP failed to comply with the documentation requirements of the Westlake/CCP contract. Without the information required by the contract, Westlake could not determine if CCP was properly invoking the clause. Indeed, as Westlake points out, the actions of CCP were consistent with a buyer who had received a voluntary allowance from a seller or bought on the spot market and not consistent with the actions of a buyer who had met the criteria specified in the parties' agreement. In light of CCP's failure to provide (1) written evidence of a legitimate price of like quantity on substantially similar terms, and (2) evidence that the offer was valid over the term of the Westlake/CCP contract, there is no genuine issue of material fact to preclude summary judgment in favor of Westlake.

■ Even if we were to conclude that CCP's production of the Amoco contract in 1995 satisfied the requirements of the "meeting competition" clause, that contract would not produce the lower price reflected in the October 1996 invoice. The pricing formula of the Amoco contract was identical to the pricing formula of the Westlake/CCP contract. Therefore, the price calculated under the Amoco contract should have been identical to what West-

lake was offering.[3] Although CCP alleges that the Amoco contract contained rebate and other provisions which made it different from the Westlake/CCP contract, CCP did not identify those provisions or allege that such provisions accounted for the lower price, nor did CCP otherwise establish that the price offered was valid over the term of the Westlake/CCP contract. Even taking the evidence of other rebate or price adjustment provisions as true, we cannot blindly leap to the conclusion that the invoice price was calculated under one of those provisions. A general statement that the Amoco contract had rebate and other price adjustment provisions does not raise a genuine issue of material fact sufficient to defeat summary judgment. We overrule CCP's second issue.

## AFFIRMATIVE DEFENSES RAISED IN SUMMARY JUDGMENT RESPONSE

■ In its third issue, CCP asserts that the trial court improperly granted the motion for summary judgment because CCP raised a question of fact on several affirmative defenses, namely failure to mitigate, ambiguity, and estoppel. For a nonmovant, such as CCP, to avoid summary judgment based upon an affirmative defense, it "must produce sufficient summary judgment evidence to raise a question of fact as to each element of the affirmative defense." *Wiggins v. Overstreet,* 962 S.W.2d 198, 200 (Tex.App.—Houston [14th Dist.] 1998, pet. denied). We now examine each of CCP's affirmative defenses to determine if CCP met this requirement.[4]

### Mitigation of Damages

■ CCP argues that Westlake failed to mitigate its damages. To support this argument, CCP points out that the price

---

3. There was a voluntary allowance provision under the Amoco contract that could have provided for the price differential, but then the offer would not have been valid over the term of the Westlake/CCP contract since any price break under that provision would have been contingent on the sole discretion of the

seller. Therefore, that price would not be a price that Westlake had to meet under the "meeting competition" clause.

4. Having already decided that the contract is not ambiguous as a matter of law, we do not reach any factual questions on ambiguity.

Westlake obtained for the styrene monomer on the spot market was much lower than the price CCP had offered. CCP argues that *had* Westlake sold the product to CCP at the price CCP offered each month (which was less than the formula price under the Westlake/CCP contract), Westlake could have mitigated its damages significantly; therefore, CCP argues, Westlake is not entitled to the full amount awarded. We reject CCP's argument.

As the breaching party, CCP had the burden of proving that damages could have been mitigated. *See Copenhaver v. Berryman*, 602 S.W.2d 540, 544 (Tex. Civ.App.—Corpus Christi 1980, writ ref'd n.r.e.); *Houston Chronicle Pub. Co. v. McNair Trucklease, Inc.*, 519 S.W.2d 924, 929 (Tex.Civ.App.—Houston [1st Dist.] 1975, writ ref'd n.r.e.). Although an injured party is required to exercise reasonable efforts to minimize damages, it is not required to mitigate its losses "by accepting an arrangement with the repudiator if that is made conditional on [its] surrender of [its] rights under the repudiated contract." *Publicker Chemical Corp. v. Belcher Oil Co.*, 792 F.2d 482, 488 (5th Cir. 1986). Westlake's acceptance of CCP's price, as presented, would have required Westlake to forgo its entitlement to the contract price and/or recognize the existence of a competitive situation under the "meeting competition" clause, an event which Westlake disputed and which we have found did not occur. Had Westlake accepted CCP's offer as presented, it would have surrendered its right to insist on the formula price under the repudiated Westlake/CCP contract. Westlake was not required to mitigate its damages by forgoing its rights under the contract. Without other evidence that damages could have been mitigated, CCP failed to raise a question of fact on failure to mitigate.

### Equitable Estoppel

CCP argues that Westlake was not entitled to recover based on principles of equitable estoppel. A defensive doctrine founded on principles of fraud, equitable estoppel requires, among other things, a false representation or concealment of material facts. *See Schroeder v. Texas Iron Works, Inc.*, 813 S.W.2d 483, 489 (Tex.1991). To support its equitable estoppel defense, CCP claims that Westlake made a false representation when it represented in the contract that competitive prices would be honored if the conditions of the "meeting competition" clause were met. There are at least two fatal flaws in CCP's argument.

First, a refusal by Westlake to honor the competitive price alone would not be evidence of a false representation in the contract; yet, that is the *only* summary judgment proof CCP offered to show a false representation. Second, the "meeting competition" clause had very specific requirements for the type of evidence CCP had to produce in order to trigger Westlake's obligation under that provision. Westlake did not represent that it would meet *any* price *without the evidence required* by the "meeting competition" clause. To the contrary, Westlake contracted to meet a competitive price if and when CCP produced satisfactory written evidence. Because CCP did not produce the requisite documentation, Westlake's obligation to perform under the "meeting competition" clause was never triggered. Thus, CCP's equitable estoppel argument fails.

### Quasi Estoppel

CCP also argues that Westlake is barred under the doctrine of quasi estoppel from demanding written evidence of the competitive price in light of (1) Westlake's agreement to accept a lower price for July and August 1996 and (2) the testimony of Westlake's president that only an invoice and evidence of a contract valid over the same term were required to invoke the "meeting competition" clause.

Quasi estoppel is an equitable doctrine that prevents a party from repudiating an act or assertion if it would harm another who reasonably relied on the act or assertion. Under this defensive doctrine, a party is precluded from asserting a right to the disadvantage of another, where doing so would be inconsistent with the party's previous position. *See Steubner Realty 19, Ltd. v. Cravens Road 88, Ltd.*, 817 S.W.2d 160, 164 (Tex.App.—Houston [14th Dist.] 1991, no writ).

CCP first argues that the principles of quasi estoppel bar Westlake from insisting on CCP's compliance with the contract's "written evidence" requirement based on the fact that Westlake gave a prior price reduction without insisting on written evidence. This argument fails because there was no evidence that Westlake had ever lowered the price under the "meeting competition" clause without the requisite written evidence. Notably, when CCP asked for a lower price in July and August of 1996, Westlake agreed to a reduced price but not to the price CCP had requested. Westlake claims to have granted this reduction under the provision which gave it discretion over temporary allowances and reductions, *not* under the "meeting competition" clause. Under the former, Westlake was entitled to lower the price, in its discretion, at any time. Had the price been reduced pursuant to the terms of the "meeting competition" clause, Westlake would have had to meet the price CCP asked. There is nothing in the record to suggest that the price reduction was granted under the "meeting competition" clause. To the contrary, the evidence suggests that Westlake gave CCP a temporary voluntary price allowance that yielded a price that was higher than the price CCP had requested, but that was lower than the contract's formula price. The fact that Westlake exercised its rights under the discretionary clause does not estop it from insisting on compliance with another provision of the same contract. We find that CCP failed to raise a fact issue on quasi estoppel arising out of Westlake's agreement to accept a lower price in July and August of 1996.

CCP also argues that the testimony of Westlake's president bars Westlake from insisting on written evidence. He testified that under his reading of the contract, CCP had to produce only an invoice showing the competitive price and evidence of a contract which is valid for the same term as the Westlake/CCP contract in order to invoke the "meeting competition" clause. This testimony, however, was not given nor was the president's view stated until the lawsuit commenced. Therefore, CCP could not possibly have relied on the president's statements in entering into the contract or at any time before suit was filed. Furthermore, there is nothing in the record to suggest that Westlake ever represented that, contrary to the express terms of the contract, only two items were necessary to invoke the "meeting competition" clause. Even if it had, there is nothing to demonstrate that CCP changed its position in detrimental reliance. Thus, CCP failed to raise a question of material fact as to quasi estoppel with regard to the testimony of Westlake's president.

Having determined that CCP failed to raise a question of fact on any of the affirmative defenses asserted in response to Westlake's motion for summary judgment, we overrule the third issue.

### FAILURE TO ESTABLISH ELEMENTS OF *PRIMA FACIE* CASE

In its fourth issue, CCP claims the trial court erroneously granted summary judgment because Westlake did not prove the elements of its *prima facie* case for recovery of damages under either UCC section 2.706 or UCC section 2.708, as adopted in the Texas Business and Commerce Code. A plaintiff must offer legally sufficient proof on every element of its case to entitle it to summary judgment. *See Swilley v. Hughes,* 488 S.W.2d 64, 67 (Tex.1972); *Green v. Unauthorized Prac-*

*tice of Law Committee*, 883 S.W.2d 293, 297 (Tex.App.—Dallas 1994, no writ). Westlake's first response is that it was not required to do so because the matters CCP raised under UCC sections 2.706 and 2.708 are affirmative defenses. We now examine these UCC provisions to determine if they are in the nature of affirmative defenses, which would place the burden on CCP, or part of the claimant's *prima facie* case, which would place the burden on Westlake.

### Recovery of Damages Under UCC § 2.706

 UCC section 2.706, as adopted in Texas, authorizes an aggrieved seller to resell the contract goods and to measure its damages by the difference between the contract price and the resale price. Where, as here, the seller chooses to resell privately, section 2.706 sets out three simple steps the seller must follow:

(1) identify the resale contract to the broken contract;

(2) give the buyer reasonable notice of the seller's intention to resell; and

(3) resell in good faith and in a commercially reasonable manner.

*See* Tex. Bus. & Com.Code § 2.706 (Vernon 1994).

CCP claims that because Westlake failed to prove (1) presale notice and (2) commercial reasonableness, it cannot recover under section 2.706. Texas has not decided whether recovery under section 2.706 is precluded in the absence of strict compliance with its terms. However, several other UCC states have considered the matter and concluded that recovery under section 2.706 is precluded if the seller does not prove each of the elements. *See Larsen Leasing, Inc. v. Thiele, Inc.*, 749 F.Supp. 821, 823 (W.D.Mich.1990) (finding party seeking damages must plead and prove sale was made in good faith and in a commercially reasonable manner); *Sprague v. Sumitomo Forestry Co., Ltd.*, 104 Wash.2d 751, 709 P.2d 1200, 1204 (1985) (finding party seeking damages

must show notice of intent to resell); *Anheuser v. Oswald Refractories Co.*, 541 S.W.2d 706, 711 (Mo.Ct.App.1976) (finding party seeking damages must plead and prove compliance with notice requirements). Therefore, characterizing the terms of section 2.706 as essential elements of a seller's *prima facie* case is consistent with the characterization adopted in other UCC states.

 Characterizing the requirements set forth in section 2.706 as elements of a seller's *prima facie* case for recovery of damages is also consistent with the way Texas courts have traditionally distinguished affirmative defenses from the elements of a *prima facie* case. Generally speaking, affirmative defenses are any propositions that a defendant may interpose to defeat the plaintiff's *prima facie* case. *See W.R. Grace Co. v. Scotch Corp., Inc.*, 753 S.W.2d 743, 746 (Tex.App.—Austin 1988, writ denied). "They do not rebut any factual propositions asserted in the plaintiff's case, but open the way for the defendant to adduce evidence establishing an *independent* reason why the plaintiff may not recover." *Id.* "An affirmative defense usually accepts the existence at one time or another of a *prima facie* case but alleges propositions which, if established, would defeat the claim." *Cooper v. Scott Irr. Const., Inc.*, 838 S.W.2d 743, 747 (Tex. App.—El Paso 1992, no writ) (dissenting opinion). By claiming that Westlake failed to give presale notice and failed to act in a commercially reasonable manner, CCP is not seeking to establish independent reasons why Westlake should not recover damages under section 2.706; rather, these allegations tend to rebut the factual propositions necessary for Westlake to recover under section 2.706.

 Finally, in making the determination, we note that the seller is in the best position to know what affirmative steps were taken to ensure the sale was conducted in a commercially reasonable manner and whether notice of intent to resell was

given to the buyer. It would make no sense to impose the burden on the buyer to prove a negative as an affirmative defense, i.e., to prove the seller's failure to satisfy the elements of section 2.706. Considering the plain language of the statute and other UCC states' characterizations, and applying traditional notions of Texas jurisprudence, we find that presale notice and commercial reasonableness are elements of a *prima facie* claim for damages and not affirmative defenses.

Westlake, anticipating this possibility, next argues that because it pled that the conditions precedent to recovery had been satisfied, under Texas Rule of Civil Procedure 54, it was merely required to offer summary judgment proof on those conditions CCP specifically denied. *See* TEX.R. CIV. P. 54. Because CCP failed to specifically deny that any conditions precedent had been satisfied, Westlake contends its failure to plead presale notice and commercial reasonableness as part of its *prima facie* case is inconsequential. The record, however, does not support Westlake's factual assertions. Westlake did not plead that all conditions precedent to its recovery on the contract had been performed or had occurred, but only that all "conditions precedent to Westlake's recovery of *attorney's fees* have been performed." [5] Pleading the performance of conditions precedent to the recovery of attorney's fees merely relieved Westlake of the burden of proof, in the absence of a specific denial, on those conditions precedent to the recovery of attorney's fees.[6] A statement that conditions precedent to the recovery of attorney's fees have been performed is not tantamount to pleading that all conditions precedent to recovery on the breach of contract claim have occurred or have been performed. Consequently, Westlake's reliance on Rule 54 is misplaced.

Even if its pleading were sufficient, Westlake still would not be able to prove the *prima facie* elements of section 2.706 because Westlake did not give CCP notice of intent to resell the product. Therefore, Westlake could not recover under section 2.706 in any event.

Westlake's inability to prevail under section 2.706, however, is not necessarily fatal to its recovery of damages on a breach of contract claim. The comments to section 2.706 provide that failure to comply with the procedural provisions of that section still leaves the seller its remedy under UCC section 2.708. *See* TEX. BUS. & COM. CODE ANN. § 2.706 (cmt.2) (Vernon 1967).

## Measure of Damages Under UCC § 2.708

 Section 2.708, which embodies the seller's right to the traditional contract market differential recovery, basically provides that the seller's measure of damages for non-acceptance of goods is (a) the difference between the market price and the unpaid contract price (together with incidental damages but less expenses saved) or (b) if the first measure of damages is inadequate, the profit which the seller would have made from full performance by the buyer. *See* TEX. BUS. & COM.CODE ANN. § 2.708 (Vernon 1994). The party bringing suit under section 2.708(b) must plead and prove each element of recoverable damage. *See Lakewood Pipe of Texas, Inc. v. Conveying Techniques, Inc.*, 814 S.W.2d 553, 556 (Tex.App.—Houston [1st Dist.] 1991, no writ). A party bringing suit under section 2.708(a) must also plead and prove the elements of section 2.708 to make its *prima facie* case for damages. "[T]he measure of damages for non-acceptance or repudiation by the buyer is the difference between the *market price* at the time and place for tender and the unpaid

5. Emphasis added.

6. Those conditions are: (1) the party seeking attorney's fees was represented by an attorney; (2) the claim was presented to the other party or its duly authorized agent; and (3) the

other party failed to pay the amount owed before the expiration of thirty days after the claim was presented. *See* TEX. CIV. PRAC. & REM.CODE ANN. § 38.002 (Vernon 1997).

contract price. . . ." TEX. BUS. & COM.CODE ANN. § 2.708(a) (Vernon 1994) (emphasis added). CCP claims that Westlake failed to prove the "market price" of styrene monomer at the time of its resale on the spot market, as required by section 2.708.

 Texas courts have yet to interpret the meaning of "market price," but the term is generally defined as the "prevailing price at which something is sold in a specific market." BLACK'S LAW DICTIONARY 1207 (7th ed.1999). "Spot price" is defined as the "amount for which a commodity is sold in a spot market." *Id.* When the resale price is from an arm's length transaction, it adequately represents market price. We find that the spot price is an adequate representation of the market price of a commodity such as styrene monomer.

Section 2.708 directs the aggrieved seller to measure the market "at the time and place for tender." TEX. BUS. & COM.CODE ANN. § 2.708(a) (Vernon 1994). Although the Westlake/CCP contract does not specify the time and place for tender, it is clear from the invoices in the record that Westlake made several shipments to CCP each month at various locations. The formula price set out in the Westlake/CCP contract was computed on a monthly basis and the contract provided that the buyer would purchase and receive the product in equal monthly quantities. As part of its summary judgment proof, Westlake provided an average monthly spot price instead of the spot price for every sale. We find this proof is sufficient under the facts of this case to establish this element of a section 2.708 damage claim. We overrule CCP's fourth issue.

### AFFIRMATIVE DEFENSES NOT ADDRESSED BY MOTION FOR SUMMARY JUDGMENT

 In its fifth issue, CCP argues the trial court erred in granting summary judgment when Westlake did not address all of CCP's affirmative defenses in its motion for summary judgment. A defendant seeking to avoid summary judgment based on an affirmative defense is in much the same position as a plaintiff seeking to avoid summary judgment based on an affirmative claim. In order to avoid summary judgment, a plaintiff must produce evidence to raise a genuine issue of material fact as to each element of its claim. *See* TEX.R. CIV. P. 166a(i). Likewise, to avoid summary judgment, a defendant must produce evidence to raise a genuine issue of material fact as to each element of its affirmative defense. *See "Moore" Burger, Inc. v. Phillips Petroleum Co.,* 492 S.W.2d 934, 936–37 (Tex.1972); *Wiggins,* 962 S.W.2d at 200. Merely pleading an affirmative defense will not preclude summary judgment. *See Nicholson v. Memorial Hospital Sys.,* 722 S.W.2d 746, 749 (Tex. App.—Houston [14th Dist.] 1986, writ ref'd n.r.e.). In order to rely on its affirmative defenses to defeat Westlake's motion for summary judgment, it was incumbent upon CCP to come forward with evidence to raise a genuine issue of material fact as to each element of each of its affirmative defenses. CCP did not. Westlake did not have to address CCP's affirmative defenses in Westlake's motion for summary judgment. We overrule the fifth issue.

### ANTICIPATORY REPUDIATION OF CONTRACT

 In its seventh issue, CCP claims that Westlake's failure to provide assurance of due performance in response to CCP's requests for the lower price constituted anticipatory repudiation of the parties' contract, thereby excusing CCP from performance. Anticipatory repudiation is an affirmative defense to a breach of contract claim. Under this defensive theory, an injured party is discharged from its remaining duties to perform under a contract where the other party repudiates its contractual duty before the time for performance. Traditionally, this type of repudiation occurs when the promissor unequivocally disavows any intention to perform in the future. These time-honored principles of anticipatory repudiation are embodied in UCC section

2.609, as adopted in Texas. Under this statutory provision, when reasonable grounds for insecurity arise with respect to the performance of either party under a contract, the other may demand adequate assurance of due performance. *See* TEX. BUS. & COM.CODE ANN. § 2.609(a) (Vernon 1994). The insecure party may suspend any performance for which it has not already received the agreed return until the assurance is received. *See id.* Failure to provide assurance of due performance within thirty days following receipt of a justified demand constitutes repudiation of the contract. *See id.* § 2.609(d).

CCP contends that the letters it sent to Westlake in December of 1996, and February, April, May, June, July, August and October of 1997, asking if Westlake intended to match the competitive price Amoco had purportedly offered, constituted requests for adequate assurance. CCP argues that Westlake's failure to respond to these letters constituted a repudiation of the Westlake/CCP contract and released CCP from its contractual obligations to purchase product from Westlake each month no adequate assurance was provided. According to CCP, once Westlake repudiated the parties' contract, CCP had the option of awaiting performance or suing for breach, and that, in either case, it was justified in suspending its own performance under the Westlake/CCP contract.

■ Issues that are not expressly presented to the trial court by the answer, motion or other response are not grounds for reversal. *See* TEX.R. CIV. P. 166a(c); *see also Hollingsworth v. City of Dallas,* 931 S.W.2d 699, 705 (Tex.App.—Dallas 1996, writ denied) (finding appellant cannot raise affirmative defense on appeal when it failed to plead affirmative defense in its written response to other party's motion for summary judgment). To rely on UCC section 2.609 as a bar to West-

lake's claims, CCP would have had to have raised the defense in its pleadings as well as in its summary judgment response. CCP, however, failed to raise these matters in the trial court and, accordingly, has waived them.

■ Even if CCP had properly pleaded and raised anticipatory repudiation, its arguments under UCC section 2.609 would still fail. The party invoking section 2.609 must have "reasonable grounds for insecurity." Inasmuch as CCP had failed to produce the written evidence required by the Westlake/CCP contract, CCP had no reasonable grounds for insecurity as to Westlake's performance. Westlake's obligation to meet the competitive price was triggered only by CCP's compliance with the documentation requirement of the "meeting competition" clause. CCP never satisfied that requirement. Moreover, there is nothing in the record to suggest that Westlake communicated any intention not to perform under the "meeting competition" clause if and when CCP produced the requisite documentation. CCP could have no basis for insecurity and no grounds to request adequate assurance under section 2.609 until after it presented the requisite documentation to trigger Westlake's obligation to perform. Having failed to do so, CCP had no reasonable grounds for insecurity and thus could not rely on section 2.609.

Furthermore, only an "aggrieved party" is entitled to invoke section 2.609. UCC section 1.201 defines an "aggrieved party" as a party that is entitled to resort to a remedy. *See* TEX. BUS. & COM.CODE ANN. § 1.201 (Vernon 1994). Inasmuch as CCP had failed to present the necessary documents, it was in no position to assert a breach by Westlake or to resort to a remedy.[7]

CCP's failure to raise its section 2.609 argument in the trial court and its result-

---

**7.** Westlake brought suit against CCP in December of 1996. All but one of the demands for adequate assurance were sent after that date and long after CCP had failed to fulfill its purchase obligations.

ing waiver of that defense notwithstanding, we find that CCP did not produce sufficient evidence on summary judgment to raise a question of fact as to whether Westlake's failure to provide adequate assurance of due performance constituted a repudiation of the contract. Accordingly, we overrule the seventh issue.

### RATE OF PREJUDGMENT INTEREST

In its sixth issue, CCP argues the trial court erred in awarding prejudgment interest at eighteen percent. According to CCP, the provision in the Westlake/CCP contract on which the trial court purportedly relied in arriving at the prejudgment interest rate applies only to interest charged on overdue invoices and not to the calculation of prejudgment interest on a damage award.[8] The parties' contract states:

> INVOICE AND PAYMENT. Invoices for Products purchased by Buyer shall be rendered promptly following shipment. Payment of each invoice shall be made by Buyer to the location specified therein in such manner as will place the Seller in possession of United States Currency or equivalent domestic bank demand deposit in the full amount thereof within thirty (30) days following the date of such invoice. Buyer shall pay interest on all past due amounts at the lower of (1) one and one-half percent (1½ %) per month or (2) the maximum non-usurious rate permitted by applicable law; provided, however, that should Buyer dispute the accuracy of any portion of any invoice, Buyer may withhold payment of the disputed amount and shall promptly notify Seller specifying the amount in dispute and the reasons therefor. Buyer will make timely payment of any amounts not in dispute. The parties will promptly attempt to resolve the dispute and upon resolution, Buyer will promptly pay all additional amounts due Seller.

CCP argues that because Westlake stopped sending invoices to CCP when it stopped shipping product, "there was nothing to trigger the interest obligation" and the trial court erred in awarding prejudgment interest at the rate of eighteen percent. We reject this argument.

The Texas Finance Code provides for awards of prejudgment interest in wrongful death, personal injury, and property damage cases and sets the rate equal to the postjudgment interest rate. *See* TEX. FIN.CODE ANN. §§ 304.102, 304.103 (Vernon 1998). The Texas Supreme Court has held that prejudgment interest equals postjudgment interest in a breach of contract case. *See Johnson & Higgins of Tex., Inc. v. Kenneco Energy, Inc.,* 962 S.W.2d 507, 532 (Tex.1998). When a contract provides for a specific interest rate, the postjudgment interest will be the lesser of: (a) the rate specified in the contract or (b) 18% a year. *See Triton Oil & Gas Corp. v. E.W. Moran Drilling Co.,* 509 S.W.2d 678, 687–88 (Tex. Civ.App.—Fort Worth 1974, writ ref'd n.r.e.) (where seller provided services and equipment). Here, the parties' contract provides that 1.5% interest will be paid a month on amounts that are thirty days past due for goods delivered. Inasmuch as the Westlake/CCP contract calls for monthly compounding of interest, the rate specified in the contract exceeds eighteen percent a year. Westlake is thus entitled to prejudgment interest at the lesser statutory rate of eighteen percent a year, which is exactly the rate specified in the final judgment. We overrule the sixth issue.

The judgment of the trial court is affirmed.

---

8. The final judgment recites only the rate of prejudgment interest and is silent as to the trial court's rationale for determining the rate.