**MOBIL EXPLORATION AND PRODUCING U.S., INC.,**
Appellant,

v.

**DOVER ENERGY EXPLORATION, L.L.C., Appellee.**

No. 14–00–00863–CV.

Court of Appeals of Texas, Houston (14th Dist.).

Aug. 23, 2001.

Warren Szutse Huang, Reagan M. Brown, Houston, for appellants.

Steven B. Harris, Richard James Judge, Robert L. Ketchand, Houston, for appellees.

Panel consists of Justices YATES, FOWLER, and WITTIG.

## OPINION

WITTIG, Justice.

This is an oil and gas contract interpretation and construction case. Mobil and Dover signed a series of agreements concerning Dover's proprietary information about offshore drilling prospects. One contract obligated Mobil to grant Dover overriding royalties if it acquired a lease on a certain prospect. Mobil later acquired the lease but refused to grant the royalties, claiming that its obligation to do so had expired under the terms of the various agreements. Dover sued Mobil for breach of contract and the trial court found for Dover. We affirm.

### Background

In an attempt to revive its offshore oil and gas exploration program in the Gulf of Mexico, Mobil sought to form relationships with companies that had an inventory of "prospects"[1] for oil exploration. A third party introduced Dover to Mobil. On February 4, 1997, the parties executed a Confidentiality Agreement pertaining to a number of prospects, including Ship Shoal Blocks 36 and 37 (blocks 36/37). Under that contract, Mobil agreed as follows: (1) Mobil would only use Dover's proprietary information to evaluate the feasibility of a joint exploration and production program with Dover pertaining to the listed prospects; (2) Mobil would not disclose the information to other parties; (3) if Mobil acquired any of the prospects, it would notify Dover, who, in turn, would have the right to acquire that interest from Mobil for 75% of the cost Mobil incurred in making the acquisition. Finally, the agreement stated: "The obligations of Confidentiality created by this agreement shall ... terminate on either (i) July 3, 1997 or (ii) ... 120 days from the date of Outer Continental Shelf, Central Gulf of Mexico, Oil and Gas Lease Sale 166 [OCS 166], whichever is later." OCS 166, scheduled to take place in March 1997, was one of a series of auctions held by the Mineral Management Service of the U.S. Department of the Interior.

On February 24, the parties entered into a letter agreement, which was drafted by Mobil. The agreement began with the recital, "Pursuant to our recent technical reviews of certain Dover-generated prospects available for the upcoming OCS Sale 166 ... [Mobil] hereby makes the following offer for an exclusive option on the 'Prospects' ... listed in Exhibit A...." Blocks 36/37 were not included in that agreement, but, as discussed below, were optioned in a February 28 agreement expressly made pursuant to the February 24 agreement. The February 24 agreement established a three-tier compensation structure for Mobil's option. First, Mobil paid a non-refundable fee of $150,000 for the exclusive option of acquiring the listed prospects from Dover. Mobil paid Dover

---

1. According to Mobil, a "prospect" is a location where hydrocarbons such as oil and gas are believed to be present in quantities which are economically feasible to produce. Dover uses geological and geophysical data to generate prospects for sale to companies like Mobil, who use the prospects to determine what offshore properties to acquire and where to drill.

another fee of between $50,000 and $150,000 for any prospect for which it exercised the option. Finally, Mobil inserted the following provision, which Dover claims as central to its right to be paid under this suit: "[Mobil] shall grant Dover on each Oil and Gas Lease covering the chosen Prospects and actually awarded to [Mobil] an overriding royalty interest (ORRI). . . ." This agreement also contained a confidentiality provision which, in contrast to the February 4 confidentiality agreement, obligated Dover not to disclose information about the listed prospects during the option period or "such periods . . . chosen by [Mobil], if any."

On February 25, referencing only the February 24 agreement, Mobil exercised its option on some of the prospects, but not blocks 36 and 37. In the letter, however, Mobil stated it may choose to acquire a larger group of prospects than originally anticipated. It also stated its desire was to have the "highest grade portfolio with which to participate in OCS sale 166." On February 28, under a letter agreement with the heading "Second Election Under Exclusive Option Agreement Dated February 24, 1997," Mobil exercised its option on blocks 36 and 37.

In March, 1997, at OCS 166, Mobil bid on blocks 36 and 37. It was only successful in acquiring block 36. Mobil paid Dover the agreed-upon royalties for block 36. Approximately one year later, at OCS 169, Mobil placed a much higher bid on block 37 and acquired it. Dover requested the royalty interest, as outlined in the February 24 agreement. Mobil refused, stating its obligation to pay Dover had lapsed when the February 4 confidentiality agreement expired. Dover sued. After the trial court heard substantial evidence, it found the February 24 contract unambiguously obligated Mobil to grant Dover the royalties on block 37 when it leased it at OCS 169. The court signed findings of fact and conclusions of law.

### Issues

Mobil argues that the February 4 and February 24 agreements must be read together as a single contract. In doing so, and in light of the surrounding circumstances, which show that the parties did not intend their relationship to extend beyond OCS 166, Mobil contends the agreements unambiguously state that Mobil's obligation to pay Dover ended when the February 4 confidentiality agreement expired. Alternatively, Mobil claims that because the royalty provision in the February 24 agreement includes no termination date, and because the agreement references OCS 166, it is ambiguous as to time limitation and that applying a time limitation is necessary to effectuate the partes' intent.[2]

Dover counters that the court need look no further than the February 24 agreement. Under its terms, Dover argues, Mobil is unambiguously required to grant royalties to Dover where it acquires any prospects made under the agreement, regardless of time limitation. Dover argues in the alternative that the legal effect of Mobil's obligations is unchanged even if the February 4 and 24 agreements are read together.

### Standard of Review

 This was a bench trial in which the trial judge entered findings of fact and conclusions of law. We review conclusions of law *de novo* and uphold them if they can

---

**2.** Mobil did not option blocks 36/37 until its February 28 agreement. However, because the February 28 letter invoking the option expressly did so in reference to the February 24 letter, Mobil does not appear to deny it was bound to pay a royalty for blocks 36/37 under the terms of the February 24 letter, if that agreement were still in effect.

be sustained on any legal theory supported by the evidence. *Johnston v. McKinney Am., Inc.*, 9 S.W.3d 271, 277 (Tex.App.—Houston [14th Dist.] 1999, pet. denied). Mobil does not challenge any of the court's specific findings of fact. We note, however, that in this appeal, both parties implicitly contest fact issues-most of them pertaining to surrounding circumstances of the transactions-which were not covered in the court's written findings of fact. Because the court found for Dover, we presume those facts in support of the judgment where there is sufficient evidence to support them. *See* Tex.R. Civ. P. 299 (omitted unrequested elements, when supported by evidence, will be supplied by presumption in support of the judgment); *Vickery v. Comm'n for Lawyer Discipline*, 5 S.W.3d 241, 252–53 (Tex.App.—Houston [14th Dist.] 1999, pet. denied) (in cases where the court makes explicit findings of fact, additional facts may be presumed if there is supporting evidence for the finding).

## Analysis

We first determine whether the February 24 agreement may be construed as a matter of law. At the outset, we note that conflicting interpretations of a contract and unclear and uncertain language do not necessarily mean a contract is ambiguous. *Kelley–Coppedge, Inc. v. Highlands Ins. Co.*, 980 S.W.2d 462, 465 (Tex. 1998). A contract is not ambiguous if it can be given a certain and definite meaning or interpretation. *Coker v. Coker*, 650 S.W.2d 391, 393 (Tex.1983). We must interpret an unambiguous contract as a matter of law. *Id.*

In the first step of the ambiguity analysis, our primary concern is to determine and give effect to the intentions of the parties as expressed in the instrument. *Id.* The language in a contract is to be given its plain grammatical meaning unless

doing so would defeat the parties' intent. *DeWitt County Elec. Coop., Inc. v. Parks*, 1 S.W.3d 96, 101 (Tex.1999). In determining the intention of the parties, we look only within the four corners of the agreement to see what is actually stated, and not at what was allegedly meant. *Cook Composites, Inc. v. Westlake Styrene Corp.*, 15 S.W.3d 124, 132 (Tex.App.—Houston [14th Dist.] 2000, pet. dism'd). We must consider all of the provisions with reference to the entire contract; no single provision will be controlling. *Coker*, 650 S.W.2d at 393. In construing the contract, we consider how a reasonable person would have used and understood the language, by pondering the circumstances surrounding the contract's negotiation, and by considering the purposes the parties intended to accomplish by entering into the contract. *Westlake Styrene*, 15 S.W.3d at 132. We are free to examine prior negotiations and all other relevant incidents bearing on the intent of the parties; however, the parties may not contradict or vary the terms of the agreement by oral statements of their intentions. *Sun Oil Co. (Delaware) v. Madeley*, 626 S.W.2d 726, 734 (Tex.1981); *Westlake Styrene*, 15 S.W.3d at 132. We look to these circumstances merely to assist us in understanding the object and purpose of the contractual language the parties chose. *Id.*

Both parties have cited evidence of circumstances surrounding execution of their agreements as well as evidence of their subjective intent, to assist in interpreting the language of the agreement. However, we only consider the surrounding circumstances at this point. *Balandran v. Safeco Ins. Co. of Am.*, 972 S.W.2d 738, 741 (Tex.1998) ("While parol evidence of the parties' intent is not admissible to create an ambiguity, the contract may be read in light of the surrounding circumstances to determine

whether an ambiguity exists."); *Madeley,* 626 S.W.2d at 734. We also note that the parties offered conflicting versions of the surrounding circumstances. Mobil relies largely on testimony of its chief landman in the negotiations, Dalton Smith. He asserted that Mobil's conversations with Dover only revolved around OCS 166 and that Mobil told Dover that it did not want its relationship with Dover to extend past OCS 166. However, Robert Williams, CEO of Dover, denied this at trial. He testified that Mobil stated it was looking for a long-term relationship. When asked if Mobil ever advised Dover that it did not want a long-term relationship and wanted one that would only cover OCS 166, Williams answered, "no." Williams also testified that the parties never discussed that the February 24 agreement to pay was to be limited to OCS 166. The trial court, as fact finder, resolved these fact issues in Dover's favor. *See* Tex.R. Civ. P. 299; *Vickery v. Comm'n for Lawyer Discipline,* 5 S.W.3d 241, 252–53 (Tex.App.— Houston [14th Dist.] 1999,. pet. denied). Viewed in the light most favorable to the judgment, then, the surrounding circumstances show that the parties did not discuss or agree to limit Mobil's obligation to grant a royalty only to leases it acquired at OCS 166.

 Mobil also argues the February 4 agreement must be construed with the February 24 agreement as a single contract. A court may determine, as a matter of law, that multiple documents, even if they are executed at different times and do not reference each other, comprise a single, unified contract. *See Fort Worth Indep. Sch. Dist. v. City of Fort Worth,* 22 S.W.3d 831, 840 (Tex.2000). However, in *Miles v. Martin,* 159 Tex. 336, 321 S.W.2d 62 (1959), the court cautioned:

> This [rule is] undoubtedly is sound in principle when the several instruments are truly parts of the same transaction and together form one entire agreement. It is, however, simply a device for ascertaining and giving effect to the intention of the parties and cannot be applied arbitrarily and without regard to the realities of the situation.

*Id.* at 65.

Here, we believe the "realities of the situation" reveal that the parties did not intend the February 4 and 24 agreements to be read together as a single agreement. In addition to the above circumstances, Williams of Dover testified that the two contracts were "completely separate." The first primarily set up the terms for Mobil to view Dover's proprietary information and to protect Dover from Mobil's unauthorized use of that information. There was nothing in that agreement pertaining to Mobil's purchase of Dover's data. Upon execution of the February 24 agreement, however, the primary purpose of the February 4 agreement was all but accomplished, and the February 24 agreement altered, if not superseded, the February 4 agreement. Mobil had already viewed Dover's prospects and decided to purchase rights to them; the February 24 transaction then established the terms of acquisition and compensation for prospects. This is not only shown by trial testimony but more potently in the language of the agreements themselves. Under the February 24 agreement, Mobil was no longer constrained to use the information "only for the purpose of evaluating the feasibility of funding a joint exploration and production program" with Dover, as stated in the February 4 agreement. Rather, in the February 24 agreement, Mobil was vested in its rights to the prospects and, Dover in turn, was required to keep the information it had about the prospects confidential. In contrast, in the earlier agreement, it was Mobil that contracted to keep Dover's data confidential. Thus, the relationship between the parties vis a vis the prospects was fundamentally

changed under the February 24 agreement.[3] It makes little sense, then, to graft the expiration provision for confidentiality—a completely different (and arguably superseded) obligation—onto Mobil's obligations to grant a royalty interest under the later contract. Still, even if the expiration date on Mobil's obligations of confidentiality from the February 4 agreement was included within the February 24 agreement itself, that provision did not address, much less limit, Mobil's entirely different obligation to grant Dover a royalty interest.

 We next examine Mobil's argument that because the February 24 agreement provides no termination date, and because of its reference to OCS 166, it is ambiguous as to time limitation, and that applying a time limitation is necessary to effectuate the partes' intent. We point out that a contract in which one party has performed all its obligations need not have a termination date. For instance, in *Kennedy v. McMullen*, 39 S.W.2d 168 (Tex. Civ.App.—Beaumont 1931, writ ref'd), the plaintiff assigned a bus route it operated to the defendant. In return, the defendant agreed to pay plaintiff a fee for each passenger it carried. The defendant later ceased making payments but continued operating the bus route. The court noted that, as a general proposition, a contract indefinite as to the time of its performance may be terminated by either party by giving notice of his intention to do so.[4] But the court held that a party who terminates or repudiates a contract cannot continue to reap the benefits of the subject matter of the contract, to the prejudice of the other party. *Id.* at 174.

An instructive scenario is also provided in *Linn v. Employers Reins. Corp.*, 397 Pa. 153, 153 A.2d 483 (1959). There, the defendant agreed to pay a finder's fee of 5% on all reinsurance premiums it received from a particular client the plaintiffs procured. The plaintiffs had no obligation to perform any additional work under the contract. *Id.* at 484. The defendant paid the fee for 27 years. One day, it suspended payments, arguing that the contract was terminable at will because it failed to specify a durational term. *Linn* squarely rejected this argument and held that because the defendant had received full performance from the plaintiffs and had accepted the benefits of its agreement, it could not turn around and repudiate its obligation. *Id.* at 485–86.[5]

3. As another example, in the first agreement, if Mobil had acquired any of the prospects at OCS 166, Dover would have been allowed to buy them back for 75% of Mobil's costs. In the February 24 agreement, Mobil paid Dover significant fees to acquire the rights to the prospects. These are clearly inconsistent terms, however, Mobil argues that they can be reconciled. For instance, it points out that there is nothing in the second contract precluding Dover from buying back the prospects from Mobil for 75% of Mobil's acquisition costs if Mobil acquired the prospects at OCS 166. Clearly, though, in light of the fact that Mobil had paid Dover substantially for the option on the prospects, allowing Dover to buy them from Mobil for a reduced cost would lead to a patently absurd result. *See Reilly v. Rangers Mgmt., Inc.*, 727 S.W.2d 527, 530 (Tex.1987) (courts will avoid, when possible and proper, a construction which is unreasonable, inequitable, and oppressive). This is supported by evidence that the buyback provision was there as a "penalty" to Mobil and to protect Dover if Mobil used its data without paying for it. In the second agreement, Mobil did pay Dover for the data, thus clearly abrogating the original buyback provision.

4. Mobil never terminated its contract with Dover in this case.

5. Mobil claims it relied on additional data provided by another firm when it purchased block 37 at OCS 169. Nonetheless, Mobil admitted at trial that Dover's intellectual property was valuable, and that Mobil utilized and never returned or released the rights to it.

As in *Kennedy* and *Linn*, it is uncontested that Dover had performed all its obligations under the contract. Dover contracted away its proprietary rights to utilize the prospect and market it to other clients. Likewise, Mobil admitted it received full performance from Dover and accepted the benefits of its agreement, which Mobil retained. Thus, in the absence of an agreement limiting the duration of its obligation to grant royalties to Dover on leases it acquired under the February 24 agreement, Mobil could not later repudiate that obligation.

Here, however, the February 24 agreement contained no such limitation. As discussed, the February 4 agreement's expiration provisions did not limit Mobil's obligations to grant Dover a royalty interest. Nor do Mobil's bare recitals, which merely reference the upcoming OCS 166, raise an ambiguity issue regarding Mobil's obligation to pay. While these recitals showed that Mobil was focused on having high-quality prospects for OCS 166, which was taking place in a matter of days, they would not lead a reasonable person to believe that the parties intended to limit Mobil's obligations to grant an override if it acquired the prospects at some future date. Thus, there was no time limitation on Mobil's obligation to grant Dover the royalty interest if it acquired block 37.

In sum, viewed in the light most favorable to the judgment, the evidence established that (1) Dover performed all its obligations under the February 24 agreement, (2) Dover terminated its rights to the prospects in favor of Mobil, and (3) there was no discussion between the parties or specific provision placing a time limit on Mobil's obligations to grant Dover royalties in the event it acquired block 37. Therefore, we find that the February 24 agreement unambiguously required Mobil to pay Dover royalties on block 37 when Mobil acquired it at OCS 169.[6] We overrule Mobil's sole issue. The judgment of the trial court is affirmed.

**6.** We note that the contract on its face clearly was unambiguous because there is no dispute that Mobil would have been required to pay royalties on block 37 if it had purchased it at OCS 166. At worst, a latent ambiguity arose when Mobil later leased block 37. *See Friendswood Dev. Co. v. McDade + Co.*, 926 S.W.2d 280, 282–83 (Tex.1996) (a latent ambiguity exists when a contract is facially unambiguous but fails as applied to the subject matter because of a collateral matter); *see also National Union Fire Ins. Co. v. CBI Indus., Inc.*, 907 S.W.2d 517, 521 (Tex.1995) (the ambiguity must become apparent when the contract is read in the context of surrounding circumstances). Assuming there were a latent ambiguity, the construction of the contract became a question for the factfinder. As noted above, the court heard evidence of the parties' conflicting testimony of their intentions and expectations pertaining to Mobil's obligations to pay. The trial court implicitly accepted Dover's testimony that the parties did not discuss limiting Mobil's obligation to pay or that their relationship was limited to OCS 166. We agree with the court's legal conclusion that the contract was unambiguous. However, assuming the contract contained a latent ambiguity, the court resolved any fact issues in that connection in Dover's favor and there was sufficient evidence to support those findings. We note that although the parties did not raise ambiguity in its pleadings, Mobil recognizes that the court tried the ambiguity issue by consent.